AMERICAN WATER DEVELOPMENT,
INC., a Colorado corporation,
Applicant–Appellant,

v.

CITY OF ALAMOSA; County of Alamosa; Alexander Ranch; Darell Keith Alexander; Richard Angell; Baca Grande Water & Sanitation District; Fred Bauder; Harold L. Bennett; Richard Blumenhein; Bonanza Road Water Users, Owners and Objectors; Lena C. Chiles; Floyd D. Chiles; Terry R. Chiles; Cyril Clayton; Dave Collins; David P. Collins; Barbara J. Collins; Colorado Division of Wildlife; Colorado Water Conservation Board; Columbine Telephone Company; Conejos Water Conservancy District; Concerned Citizens of Crestone, Colorado and Vicinity; Richard E. Conour; Elizabeth A. Conour; Cotton Creek Ranch; Town of Crestone; Fred J. Davie; Douglas M. Davie; Michael R. Dennet; Tom Enos; Dennis L. Felmlee; Oliver Powell Roemer, III, Successor Trustee Under the Trusts Under the Will of Avis Neal Roemer; First Pegasus Corporation; Freel Ranch; Eugene W. Freel; Beverly Freel; Harold L. Freel; Terry Lee Freel; Fullenwider Ranch, Inc.; Ernest Lamar Goodwin; Haidakhandi Universal Ashram; Ernest T. Harer; Grace Harer; Richard W. Hanby; Pamyla Hill; D. Robin Hood; Town of Hooper; J. Richard Johnston; Mary A. Johnston; L.D. Ranch; Town of LaJara; Henry R. Lamm; Mable A. Lamm; John N. Lawrence; KSD, Ltd.; Lazy KV Estates Homeowners Association, Inc.; Timothy N. Lovato; Lori S. Lovato; Marold Ranches; R.G. Marold; Barbara Mertian; A & M Farms; Pamela Bertin; Phillip Briscoe; Debra Briscoe; Eddie Clayton; Wayne C. Davis; Maggi Dessain; Margarita Diaz; Melvin E. Getz; Julie Goodnight; Greg Gosar; Margaret N. Herzfield; Maggie Houston–Smith; Pamela L. Lunt; Phil Martinez; Messick Farms; Richard A. Messick; Douglas G. Messick; Richard L. Messick; Sandra J. Murray; Curtis W. Nelson; Anne Silver Philleo; Robert S. Philleo; Marlene L. Pruitt; Robert A. Ress; Toni G. Romero; Marianne Sandstrom; Robert W. Simpson; W.E. Sisemote; C. Kimberly Snider; Francis E. Snider; M. Catherine Snider; Shella Snider; Katherine Steichen; Harvey V. Sullivan; Liz Washburn; John R. Wright; George Whitten, Jr.; Donald E. Whitten; Karen Whitten; Betty L. Worley; Town of Moffat; Town of Monte Vista; Jimmy R. Moore; Mary Moore; Morfitt Brothers Farm, Inc.; Darrel Neese; Harold Neese; Gayle A. Nichols; Edward R. Oliver; Otaka International; Robert A. Owens; Edwin Pace; Howard R. Platz; Rio Grande County Commissioners; Rio Grande County Farm Bureau; Rio Grande Water Conservation District; Rio Grande Water Users Association; Rito Alto and San Luis Ranches, Inc.; Rito Alto Ranch, Inc.; Rito Alto Ranchers; Arthur L. Rivale; Ileen J. Rivale; Rocky Mountain Bison, Inc.; Thomas C. Sanderson; County of Saguache; Town of Saguache; San Luis Valley Irrigation Well Owners, Inc.; San Luis Valley Water Conservancy District; Loren R. Santisteven; Julie A. Santisteven; Neil F. Seitz; Valley View Hot Springs; Martin T. Shellabarger; Patricia Shellabarger; Kenneth L. Skoglund; Mary F. Skoglund; Spiritual Life Institute of America, Inc.; David G. Stagner; Jeris A. Danielson, State Engineer; Steven E. Vandiver, Division Engineer; Travelers Insurance Company; Thomas F. Trim; Annabelle R. Trim; United States of America; Villa Grove Area Water Users, Owners and Opposers; Wagner Ranch, Ltd.; John H. Wagner; Weiss Ranches, Inc.; A.L. Wood; John M. Woodard; Erwin Young; Lynne Young, Objectors–Appellees.

AMERICAN WATER DEVELOPMENT,
INC., a Colorado corporation,
Applicant–Petitioner,

v.

RIO GRANDE WATER CONSERVATION DISTRICT; San Luis Valley Irrigation Well Owners, Inc.; The City of Alamosa; The Town of Monte Vista; The Town of LaJara; The Town of Crestone; Saguache County; Alamosa County; Rio

Grande County; Rio Grande Water Users Association; San Luis Valley Water Conservancy District; United States of America; State of Colorado; Colorado Division of Wildlife; Colorado Water Conservation Board; Jeris A. Danielson, State Engineer; Steven E. Vandiver, Division Engineer; Conejos Water Conservancy District; Oasis Land & Cattle Corp.; Oliver Powell Roemer, III, Successor Trustee Under the Trusts Under the Will of Avis Neal Roemer; Howard Platz; and Gayle Nichols, Objectors–Respondents.

Nos. 92SA141, 92SA263.

Supreme Court of Colorado, En Banc.

May 9, 1994.

Rehearing Denied June 6, 1994.

Faegre & Benson, Joseph M. Montano, Diane B. Davies, Harlan S. Abrahams, Grimshaw & Harring, P.C., Wayne B. Schroeder, Denver, for American Water Development, Inc.

Carlson, Hammond & Paddock, John U. Carlson, William A. Paddock, Melanie Kopperud Backes, Denver, for Rio Grande Water Users Ass'n and San Luis Valley Water Conservancy Dist.

Hill & Robbins, P.C., David W. Robbins, Robert F. Hill, Karen A. Tomb, Anne K. LaPorta, Denver, for Rio Grande Water Conservation Dist., San Luis Valley Water Conservancy Dist., San Luis Valley Irr. Well

Owners, Inc., City of Alamosa, Town of Monte Vista, Town of LaJara, Town of Crestone, County of Saguache, Alamosa County, Rio Grande County, and Rio Grande County Com'rs.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Patricia S. Bangert, Deputy Atty. Gen., Jennifer L. Gimbel, First Asst. Atty. Gen., Christine A. Klein, Bradley W. Cameron, Thomas W. Gibb, Asst. Attys. Gen., Natural Resources Section, Denver, for State of CO, CO Div. of Wildlife, CO Water Conservation Bd., and State and Div. Engineers for Water Div. 3.

Bruce McMillen, Saguache, for Richard Blumenhein, Bonanza Road Water Users, Owners and Objectors, David P. Collins, Barbara J. Collins, Ernest Lamar Goodwin, Lazy KV Estates Homeowners Ass'n, Inc., Marold Ranches, R.G. Marold, Loren Santisteven, Julie Santisteven, and Villa Grove Area Water Users, Owners and Opposers.

Janet Reno, U.S. Atty. Gen., Robert L. Klarquist, Atty., Appellate Section, U.S. Dept. of Justice, Environment and Natural Resources Div., Washington, DC, Michael J. Norton, U.S. Atty., James J. Dubois, Atty., General Litigation Section, U.S. Dept. of Justice, Environment and Natural Resources Div., Denver, for U.S.

Fred Bauder, pro se.

Moses, Wittemyer, Harrison and Woodruff, P.C., David L. Harrison, Raphael J. Moses, Steven P. Jeffers, Boulder, for Conejos Water Conservancy Dist., Oliver Powell Roemer, III, Successor Trustee under the trusts under the will of Avis Neal Roemer, and Howard R. Platz, Oasis Land and Cattle Corp.

No appearance for objectors-appellees Alexander Ranch, Darell Keith Alexander, Richard Angell, Baca Grande Water & Sanitation Dist., Harold L. Bennett, Lena C. Chiles, Floyd D. Chiles, Terry R. Chiles, Cyril Clayton, Dave Collins, Columbine Telephone Co., Concerned Citizens of Crestone, CO and Vicinity, Richard E. Conour, Elizabeth A. Conour, Cotton Creek Ranch, Fred J. Davie, Douglas M. Davie, Michael R. Dennet, Tom Enos, Dennis L. Felmlee, First Pegasus Corp., Freel Ranch, Eugene W. Freel, Beverly Freel, Harold L. Freel, Terry Lee Freel, Fullenwider Ranch, Inc., Haidakhandi Universal Ashram, Ernest T. Harer, Grace Harer, Richard W. Hanby, Pamyla Hill, D. Robin Hood, Town of Hooper, J. Richard Johnston, Mary A. Johnston, L.D. Ranch, Henry R. Lamm, Mable A. Lamm, John N. Lawrence, KSD, Ltd., Timothy N. Lovato, Lori S. Lovato, Barbara Mertian, A & M Farms, Pamela Bertin, Phillip Briscoe, Debra Briscoe, Eddie Clayton, Wayne C. Davis, Maggi Dessain, Margarita Diaz, Melvin E. Getz, Julie Goodnight, Greg Gosar, Margaret N. Herzfield, Maggie Houston–Smith, Pamela L. Lunt, Phil Martinez, Messick Farms, Richard A. Messick, Douglas G. Messick, Richard L. Messick, Sandra J. Murray, Curtis W. Nelson, Gayle Nichols, Anne Silver Philleo, Robert S. Philleo, Marlene L. Pruitt, Robert A. Ress, Toni G. Romero, Marianne Sandstrom, Robert W. Simpson, W.E. Sisemote, C. Kimberly Snider, Francis E. Snider, M. Catherine Snider, Shella Snider, Katherine Steichen, Harvey V. Sullivan, Liz Washburn, John R. Wright, George Whitten, Jr., Donald E. Whitten, Karen Whitten, Betty L. Worley, Town of Moffat, Jimmy R. Moore, Mary Moore, Morfitt Bros. Farm, Inc., Darrel Neese, Harold Neese, Gayle A. Nichols, Edward R. Oliver, Otaka Intern., Robert A. Owens, Edwin Pace, Rio Grande County Farm Bureau, Rito Alto and San Luis Ranches, Inc., Rito Alto Ranch, Inc., Rito Alto Ranchers, Arthur L. Rivale, Ileen J. Rivale, Rocky Mountain Bison, Inc., Thomas C. Sanderson, Town of Saguache, Neil F. Seitz, Valley View Hot Springs, Martin T. Shellabarger, Patricia Shellabarger, Kenneth L. Skoglund, Mary F. Skoglund, Spiritual Life Institute of America, Inc., David G. Stagner, Travelers Ins. Co., Thomas F. Trim, Annabelle R. Trim, Wagner Ranch, Ltd., John H. Wagner, Weiss Ranches, Inc., A.L. Wood, John M. Woodard, Erwin Young, and Lynne Young.

No appearance for objector-respondent Gayle Nichols.

## TABLE OF CONTENTS

I. Procedural History and Issues Presented................................... 357
II. Dismissal of the Land Grant Claims ...................................... 360
    A. Factual Background ................................................ 360
    B. The Spanish and Mexican Land Grant Claim ......................... 362
    C. The Claim Under the Act of June 21, 1860 .......................... 365
III. Challenges to the Determination that Water Sought to be Withdrawn is Tributary.. 366
    A. Whether the Trial Court Properly Determined the Effect of AWDI's Pro-
       posed Pumping on Surface Streams ................................ 367
    B. Whether the Trial Court Properly Determined the Nature of the Unconfined
       Aquifer and the Effect of AWDI's Proposed Pumping on that Aquifer .. 368
       1. Challenge to Natural Stream Legislation as Special Legislation ....... 370
       2. Inclusion of Unconfined Aquifer in Definition of Natural Stream ...... 371
       3. Requirement of Determination of Existing Aquifer Conditions at the
          Time of Permit Application ...................................... 372
    C. Whether the Trial Court Properly Precluded Challenge to Means of Diver-
       sion of Closed Basin Project....................................... 373
IV. Procedural Prejudice...................................................... 374
    A. Whether the Trial Court's Case Management Order and its Implementation
       Unfairly Prejudiced AWDI......................................... 374
    B. Whether the Trial Court's Rulings were Objective ..................... 375
V. Excessive and Unwarranted Findings ...................................... 376
VI. Awards of Attorney Fees, Expenses, and Costs.............................. 376
    A. Whether AWDI can Contest the Conditions of Dismissal of the Tributary
       Claim .......................................................... 377
    B. Whether Section 13–17–102(5) or C.R.C.P. 11 Precludes an Award of Attor-
       ney Fees and Expenses Incident to Dismissal of the Tributary Claim .. 379
    C. Whether the Special Nature of Water Adjudication Proceedings Precludes
       the Award of Fees and Expenses Incident to Dismissal of the Tributary
       Claim .......................................................... 381
    D. Whether the Trial Court Employed an Incorrect Standard or Relied on
       Insufficient Evidence in Assessing Fees and Expenses Incident to Dis-
       missal of the Tributary Claim..................................... 381
       1. Correctness of Standard ......................................... 381
       2. Sufficiency of Evidence .......................................... 383
          a. Identification of Fees and Expenses Attributable to Tributary
             Claim ..................................................... 383
          b. Scope of Work Performed in Defense of Tributary Claim ........ 385
          c. Reasonableness of Amounts Charged for Fees and Expenses ..... 386
       3. Summary ...................................................... 388
    E. Whether Excessive Costs were Awarded Incident to Dismissal of the
       Nontributary Claim .............................................. 388
VII. Conclusion .............................................................. 390

---

Justice LOHR delivered the Opinion of the Court.

American Water Development, Inc. appeals from a judgment of the District Court for Water Division 3 denying its application with respect to water rights for the production of 200,000 acre feet of water per year by proposed wells in the San Luis Valley of Colorado and from a later judgment of that same court awarding attorney fees, expenses, and costs to certain objectors who successful-

ly opposed the application. We consolidated these cases for all purposes on appeal[1] and now affirm both judgments.

### I. Procedural History and Issues Presented

On December 31, 1986, American Water Development, Inc. ("AWDI") filed an "Application For Underground Water Rights Or, In The Alternative, For The Determination Of Rights To Nontributary Groundwater

---

1. For purposes of clarity and simplicity we have listed the cases separately in the caption of this opinion.

Outside Of Designated Groundwater Basins" in the District Court for Water Division 3.[2] Statements of opposition were filed by numerous objectors.[3] After several years of discovery and motion practice, AWDI filed an amended application with leave of the court on August 31, 1990.[4] The statements of opposition to the original application were deemed to apply to the amended application, and additional statements of opposition were filed.

In the original application, AWDI sought to establish the right to withdraw 200,000 acre-feet of ground water per year from proposed wells to be located on lands owned or claimed by the applicant and containing more than 100,000 acres in the Closed Basin drainage of the San Luis Valley in south-central Colorado (sometimes, "the Valley").[5] The lands are made up of two noncontiguous parcels. The smaller parcel contains approximately 4,683 acres and is situated in the vicinity of the Town of Villa Grove in the northeastern part of the Valley. The larger parcel consists of Baca Grant No. 4 and adjacent lands, located approximately twenty miles to the south of Villa Grove. The original application proposed the use of 112 wells, 2,500 feet deep and perforated between the depths of 200 and 2,500 feet. Most of the wells were to be located on Baca Grant No. 4.

In its original application, AWDI asserted four alternative claims: (1) a claim for determination of a right to nontributary ground water pursuant to section 37–90–137(4), 15 C.R.S. (1990), subject to adjudication under section 37–92–203(1), 15 C.R.S. (1990), (2) a claim to water underlying Baca Grant No. 4 under Spanish and Mexican law and the 1848 Treaty of Guadalupe Hidalgo between the United States and Mexico, (3) a claim to water underlying Baca Grant No. 4 under the Act of June 21, 1860, Ch. 167, 12 Stat. 71 (1860), pursuant to which AWDI's predecessors acquired that tract from the United States,[6] and (4) a claim for determination of a water right for tributary ground water.

The amended application proposed implementation of pumping in phases, changed the number and location of wells (approximately 117 to be located on Baca Grant No. 4, and 15 to be located on AWDI's property near Villa Grove) and added a fifth claim pertaining to determination of injury from AWDI's proposed withdrawals and a proposal of methods to remedy any such injury by a plan for augmentation and other protective measures.

The original application indicated an intent to apply the water to various beneficial uses including agricultural use within the Valley. The amended application made clear for the first time that AWDI proposed to use some of the water outside the San Luis Valley along the Front Range within the State of Colorado.

2.  The Baca Ranch Company and The Baca Corporation were co-applicants with AWDI in the original application. AWDI is the sole applicant in the amended application, referred to herein, and we make no further reference to the other applicants even when discussing the original application.

3.  The objectors who participated in the trial and are appearing on this appeal are the United States of America; the State of Colorado; Rio Grande Water Conservation District; Rio Grande Water Users Association; San Luis Valley Water Conservancy District; Conejos Water Conservancy District; Oasis Land and· Cattle Company; Oliver Powell Roemer III, Trustee; Howard R. Platz; and Fred Bauder. These objectors acted in various combinations in filing and briefing motions in the trial court and in examining witnesses and presenting nontestimonial evidence during pretrial hearings and at trial. For simplicity we refer in most instances in this opinion to actions taken by "the objectors" without specifying the particular objectors or noting that others did not join.

4.  Shortly thereafter, the court permitted the substitution of an exhibit to the amended application, reflecting more current information on replacement water rights.

5.  A general description of the geographic, geologic, and hydrologic features of the San Luis Valley and of the history of water usage and the legal structure governing such usage within the Valley is set forth in *Alamosa–LaJara Water Users Protection Ass'n v. Gould*, 674 P.2d 914, 916–20 (Colo.1983). Appendix A to that case is a map of the Valley. *Id.* at 937. A description of the features of the Closed Basin appears in *Closed Basin Landowners Ass'n v. Rio Grande Water Cons. Dist.*, 734 P.2d 627, 629 (Colo.1987).

6.  We sometimes refer to the second and third claims jointly as the land grant claims.

As the case progressed, the parties attempted to narrow the issues by motions for partial summary judgment. These included a motion by the objectors to dismiss the land grant claims. On July 5, 1990, the court granted partial summary judgment dismissing those claims.

A pretrial conference was held on September 26, 1991. Near the conclusion of the pretrial conference, and without prior notice, AWDI tendered a written motion to dismiss its fourth claim—for determination of a water right for tributary ground water. The objectors argued that dismissal would prejudice them unless the dismissal order included appropriate terms and conditions, including provision for payment of their attorney fees, expenses, and costs for preparing to defend against the tributary claim. At a second pretrial conference, the court granted the motion to dismiss, without prejudice, but imposed the condition that AWDI pay to the objectors their reasonable attorney fees, expenses, and costs in opposing the tributary and related claims. The court reserved determination of the amount of such award for later proceedings.

Before the second pretrial conference, the State of Colorado, one of the objectors, moved that the trial be bifurcated if the trial court should dismiss the tributary claim. By this motion, the state sought to defer consideration of issues of injury and proposed remedies, as presented by the fifth claim, until after the trial court's determination of rights to nontributary ground water. The court granted that motion to bifurcate, and the case proceeded to trial on the nontributary claim alone.

Following a trial that began on October 15 and concluded on November 22, 1991, the court denied and dismissed the application, based on its determination that the ground water that AWDI sought to withdraw is trib-utary to natural streams, and entered judgment accordingly. Thereafter, the court held an evidentiary hearing with respect to the costs, expenses, and attorney fees to be awarded as provided in the condition included in the earlier order dismissing the tributary claim. Based on evidence presented at that hearing, the court issued a judgment awarding ten named objectors specified amounts of attorney fees, expenses, and costs totaling $2,709,881.70. AWDI appealed each of the judgments to this court,[7] and we granted a motion to consolidate the cases for all purposes.

In this appeal, AWDI assigns the following errors, as set forth in its briefs in the sequence here presented: (1) the trial court's case management order and its implementation prejudiced AWDI, and the trial court's rulings were not objective; (2) the trial court erred in its order awarding fees and costs under C.R.C.P. 41(a)(2) and 54(d); (3) the trial court erred in its pretrial partial summary judgment rulings (a) dismissing the land grant claims, (b) precluding examination of the Closed Basin Project's[8] means of diversion, and (c) holding that legislation classifying certain stream systems as natural streams subject to appropriation did not violate the prohibition of special legislation under Article V, Section 25, of the Colorado Constitution; (4) the trial court erred in rejecting AWDI's claim for determination of a right to nontributary ground water; (5) the trial court failed to identify relevant existing aquifer conditions; and (6) the trial court incorporated excessive and unwarranted findings in its order dismissing AWDI's amended application.

We first address the challenged partial summary judgment rulings on the land grant claims (Issue 3(a)), then the combination of issues concerning rejection of AWDI's nontributary ground water right claim (Issues

---

7. We have jurisdiction over these cases by virtue of Colo. Const. art VI, § 2, and § 13–4–102(1)(d), 6A C.R.S. (1987), which statutorily excludes from the court of appeals' jurisdiction appeals from final judgments of district courts in "[w]ater cases involving priorities or adjudications." See also C.A.R. 1(a)(2).

AWDI is designated as Applicant–Petitioner in case no. ˙92SA263, involving the judgment for attorney fees, expenses, and costs, because it filed a notice of appeal in the Colorado Court of Appeals as well as in this court and asked that we accept certiorari under C.A.R. 50 in the event that we deemed the court of appeals to have jurisdiction over the appeal. We accepted jurisdiction on direct appeal.

8. See infra at 372–373.

3(b) and (c), 4, and 5), next the issues concerning the case management order and the objectivity of the trial court's rulings (Issue 1), then whether the trial court's findings were excessive and unwarranted (Issue 6), and finally the challenge to the award of attorney fees, expenses, and costs (Issue 2).

## II.  *Dismissal of the Land Grant Claims*

The trial court granted the objectors' motions for partial summary judgment dismissing AWDI's claims of rights to ground water based on Spanish and Mexican law as recognized and affirmed by the United States or, in the alternative, on an absolute grant of title by the United States.[9]  These claims, in essence, are that by reason of the manner in which AWDI's predecessor obtained title to Baca Grant No. 4, all rights to underground water, whether tributary or not, underlying that tract were acquired by the original grantee and were later conveyed to AWDI.

Standards governing appropriateness of summary judgment are well settled.  Where there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law, summary judgment is warranted.  C.R.C.P. 56; *Greenberg v. Perkins,* 845 P.2d 530, 531 (Colo.1993); *Churchey v. Adolph Coors Co.,* 759 P.2d 1336, 1339–40 (Colo.1988); *Pueblo W. Metro. Dist. v. S.E. Colo. Water Cons. Dist.,* 689 P.2d 594, 600 (Colo.1984).  It is the burden of the moving party to demonstrate the absence of a triable factual issue, and any doubts as to the existence of such an issue must be resolved against that party.  *Greenberg,* 845 P.2d at 531; *Elm Distrib., Inc. v. Tri–Centennial Corp.,* 768 P.2d 215, 218 (Colo.1989).  Although the party resisting summary judgment is entitled to the benefit of all favorable inferences that may be drawn from the facts presented, the moving party's request must be granted where the facts are undisputed and the opposing party cannot prevail as a

matter of law.  *Greenberg,* 845 P.2d at 531; *see Kaiser Foundation Health Plan of Colo. v. Sharp,* 741 P.2d 714, 719 (Colo.1987).

Applying these principles to the present case, we conclude that the record demonstrates that there is no genuine issue of material fact.  The facts concerning the manner in which title passed into private ownership are undisputed.  It is only the legal effect of the relevant events and documents that is at issue.  Our task, therefore, is to determine whether the record supports the entry of partial summary judgment in favor of the objectors as a matter of law.  We begin by presenting the salient facts that formed the basis of the trial court's decision.

### A.  *Factual Background*

In 1821, Luis Maria Cabeza de Baca, on behalf of himself and a number of his male children, petitioned Mexican governmental authorities for the grant of a tract of land containing nearly 500,000 acres [10] and known as the Vegas Grandes in the vicinity of the present day city of Las Vegas, New Mexico.  H.R.Exec.Doc. No. 14, 36th Cong., 1st Sess. at 3 (1860) (hereinafter, "H.R.Exec.Doc. No. 14").  The tract was granted to Baca,[11] who settled on the land, remained for some time, and then left.  *See id.* at 3–4.  In 1835, certain other persons petitioned Mexican governmental authorities for the same land, and the petition was granted shortly thereafter with the proviso that persons who owned no land were to be permitted the same privilege of settling upon the grant as the persons who had petitioned.  *Id.* at 44.  Thereafter, several hundred families settled on the grant.  *See* S.Rep. No. 228, 36th Cong., 1st Sess. at 3 (1860) (hereinafter, "S.Rep. No. 228").

In 1848, the United States and the Republic of Mexico entered into the Treaty of Guadalupe Hidalgo, ending hostilities be-

---

**9.**  These claims relate only to Baca Grant No. 4 and do not apply to the adjacent lands or to the smaller parcel in the vicinity of Villa Grove.

**10.**  *See Lane v. Watts,* 234 U.S. 525, 527, 34 S.Ct. 965, 967, 58 L.Ed. 1440 (1914).

**11.**  Mexico achieved independence from Spain in 1821.  *See* Henry B. Parkes, *A History of Mexico*

170–72 (Houghton Mifflin 1988).  The grant to Baca was made by the provincial deputation of Durango on May 29, 1821, and was later ratified and confirmed in February 1825 by the departmental assembly of New Mexico, then a province of the Republic of Mexico.  *See* S.Rep. No. 228, 36th Cong., 1st Sess. at 3 (1860).

tween the two nations. Treaty of Peace, Friendship, Limits, and Settlement With The Republic of Mexico, Feb. 2, 1848, U.S.—Mex., 9 Stat. 922. Under Article V of the treaty, Mexico ceded certain lands to the United States. 9 Stat. at 926–28. Included within them was the Vegas Grandes. Article VIII of the treaty required the United States to respect the property of Mexican citizens in the ceded lands. 9 Stat. at 929–30.[12]

In order to establish a process for determination of land claims within the portion of the ceded lands relevant here, Congress passed the Act of July 22, 1854, Ch. 103; 10 Stat. 308 (1854). Pursuant to that act, the surveyor general of the Territory of New Mexico, within which the Vegas Grandes was situated, was given the duty "to ascertain the origin, nature, character, and extent of all claims to lands under the laws, usages, and customs of Spain and Mexico" and to report to Congress on the validity of such claims so that Congress could take "such action thereon as may be deemed just and proper, with a view to confirm *bona fide* grants, and give full effect to the treaty of eighteen hundred and forty-eight between the United States and Mexico...." *Id.* § 8 at 309. On December 18, 1858, the surveyor general issued his report with respect to the claims of the heirs of Baca and of the town of Las Vegas to the Vegas Grandes. He concluded

that the land embraced in either of the two grants is lawfully separated from the public domain and entirely beyond the disposal of the general government, and that in the absence of the one the other would be a good and valid grant; but as this office has no power to decide between conflicting parties, they are referred to the proper tribunals of the country for the adjudication of their respective claims, and the case is hereby respectfully referred to Congress through the proper channel for its action in the premises.

H.R.Exec.Doc. No. 14 at 45.

On May 19, 1860, the United States Senate Committee on Private Land Claims issued its report. It determined that the grant to Baca and his sons "is a genuine and valid title," and that later, on a petition that represented the land to be public, the same land was granted to the predecessors of the town of Las Vegas, the persons presenting the petition were put in possession, "and several hundred families are located on it." S.Rep. No. 228 at 3. The report noted that the surveyor general "has recommended the confirmation of both these titles, leaving to the respective claimants the right of adjusting their conflicting claims in the courts." *Id.* at 3–4. The report observed, however, that "the plunging of an entire settlement of families into litigation, at the imminent hazard of being turned out of their homes, or made to purchase a second time, from a private owner, lands for which they paid their government a full equivalent, in the labor, risk, and exposure by which they have converted a wilderness, surrounded by hostile savages, into a civilized and thriving settlement" would be a disastrous result. *Id.* at 4. It then stated that an alternative involving "little loss or cost to the government," *id.*, was available:

The claimants under the title to Baca, ... represented by ... counsel, have expressed a willingness to waive their older title in favor of the settlers, if allowed to enter an equivalent quantity of land elsewhere within the Territory; and your committee cannot doubt that Congress will cheerfully accept the proposal, which, indeed, would undoubtedly have been acceded to by Mexico if the Territory had remained hers, and to whose rights and duties the United States have succeeded.

*Id.*

Congress acted by adopting the Act of June 21, 1860, Ch. 167, 12 Stat. 71 (1860), confirming, among others, claim number 20, which embraced the competing claims of the

---

12. Article VIII of the treaty of Guadalupe Hidalgo provided, in relevant part:

In [the territory in question], property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guaranties equally ample as if the same belonged to citizens of the United States.
9 Stat. at 929–30.

Baca heirs and the town of Las Vegas [13] to the Vegas Grandes, and making the following provision for the heirs of Baca:

> That it shall be lawful for the heirs of Luis Maria Baca, who make claim to the said tract of land as is claimed by the town of Las Begas [sic], to select instead of the land claimed by them, an equal quantity of vacant land, not mineral, in the Territory of New Mexico, to be located by them in square bodies, not exceeding five in number. And it shall be the duty of the surveyor-general of New Mexico, to make survey and location of the lands so selected by said heirs of Baca when thereunto required by them: *Provided, however,* That the right hereby granted to said heirs of Baca shall continue in force during three years from the passage of this act, and no longer.

Act of June 21, 1860, § 6, 12 Stat. 71, 72 (1860). As the United States Supreme Court characterized it, "Congress accommodated the dispute by a magnificent donation of lands to the heirs of Baca, and confirmed the original land to the town...." *Maese v. Herman,* 183 U.S. 572, 581, 22 S.Ct. 91, 95, 46 L.Ed. 335 (1902).[14] Such a determination and resolution of claims arising under a treaty was within the province of Congress. *See United States v. Sandoval,* 167 U.S. 278, 290, 17 S.Ct. 868, 872–73, 42 L.Ed. 168 (1897); *Tameling v. U.S. Freehold & Emigration Co.,* 93 U.S. 644, 661, 23 L.Ed. 998 (1876); *Sanchez v. Taylor,* 377 F.2d 733, 737 (10th Cir.1967).

What followed is detailed in *Shaw v. Kellogg,* 170 U.S. 312, 18 S.Ct. 632, 42 L.Ed. 1050 (1898). The surveyor general of the Territory of New Mexico was directed by proper federal authority to survey the Vegas Grandes to determine the area of the grant, whereupon the Baca heirs would have the right to select an equal quantity of vacant, nonmineral land in the Territory of New Mexico in square parcels not to exceed five. *Id.* at 314, 18 S.Ct. at 633. The Baca heirs selected the Baca Grant No. 4 as one of the parcels. *Id.* at 315, 18 S.Ct. at 633–34. Prior to such selection, the Territory of Colorado had been organized, Act of February 28, 1861, ch. 59, 12 Stat. 172 (1861), and the area embraced within Baca Grant No. 4 was included within the boundaries of the newly formed territory. *See Shaw,* 170 U.S. at 316, 18 S.Ct. at 634. Following investigation and survey, the Colorado surveyor general approved the field notes, survey, and plat of Baca Grant No. 4. *See id.* at 314–25, 18 S.Ct. at 633–38. Upon such approval, in 1864 title passed pursuant to the Act of June 21, 1860, without the necessity for issuance of a patent. *Id.* at 342–43, 18 S.Ct. at 644–45. AWDI must predicate its land grant claims on the foregoing facts. We now turn to an analysis of those claims.

### B. *The Spanish and Mexican Land Grant Claim*

■ AWDI first asserts that its title to Baca Grant No. 4 is derived from a Spanish or Mexican grant [15] and has all the attributes

---

**13.** The competing claims were included within claim 20 in the surveyor general's report. Claim 20 was among the claims confirmed, "as recommended for confirmation by said surveyor-general in his reports," by section 3 of the Act of June 21, 1860. We use the term "confirmed" with respect to each of these competing claims even though Congress clearly recognized the conflict between them and provided a means for its resolution. Congress undoubtedly meant no more than to acknowledge and approve the surveyor general's conclusion that in the absence of either claim the other would be a good and valid grant. *See* Senate Rep. No. 228 at 3–4. ("The surveyor general having none but ministerial duties to perform, has recommended the confirmation of both these titles, leaving to the respective claimants the right of adjusting their conflicting claims in the courts."); *see also Lane v. Watts,* 234 U.S. at 528, 34 S.Ct. at 968 (referring to both grants as "confirmed"); *but see Shaw v. Kellogg,* 170

U.S. 312, 342, 18 S.Ct. 632, 644, 42 L.Ed. 1050 (1898) (speaking of the claim of the heirs of Baca to the Vegas Grandes, the court said, "Here there had been no claim confirmed to any tract of land, but only the grant of a right to locate.")

**14.** In *Maese,* the United States Supreme Court further noted,

> [W]e can easily see that Congress might have exercised its bounty to adjust a controversy to which a town was a party, when, if the contestants were individuals, they would have been remitted to the courts to litigate their rights and priorities.

*Maese,* 183 U.S. at 581, 22 S.Ct. at 95.

**15.** As previously noted, Mexico achieved independence from Spain in 1821. That was the year in which Baca petitioned for the grant of Vegas Grandes. It is unimportant to the resolu-

of such a grant, allegedly including transfer of all underground water, whether tributary or nontributary, underlying the granted lands. AWDI asserts that recognition of the Spanish or Mexican origin of its title is necessary in order to honor the requirement of the Treaty of Guadalupe Hidalgo that the United States respect the property rights of Mexican citizens.

"[I]ndividual rights of property, in the territory acquired by the United States from Mexico, were not affected by the change of sovereignty and jurisdiction." *Tameling*, 93 U.S. at 661. "The duty of providing the mode of securing them and fulfilling the obligations which the treaty of cession imposed, was within the appropriate province of the political department of the government." *Id.* Congress provided the necessary procedures by adopting the Act of July 22, 1854. Congress committed to the surveyor general of the Territory of New Mexico the duty of ascertaining the origin, nature, character and extent and determining the validity of all such claims in the Territory. *Tameling*, 93 U.S. at 662. The final action on each claim was reserved to Congress and not subject to judicial review. *Id.*

The land comprising Baca Grant No. 4 was never in the private domain before it was granted to the Baca heirs pursuant to the Act of June 21, 1860. It was in territory under the sovereignty of Spain and then the Republic of Mexico prior to the Treaty of Guadalupe Hidalgo. Under that treaty the United States acquired sovereignty and the land became part of the public domain.[16] In order to resolve amicably the disputed claims

to the Vegas Grandes, which was a completely different tract located in what is now the State of New Mexico, the Baca heirs, one of two sets of claimants to that latter tract, offered to "waive their older title in favor of" the other group of claimants "if allowed to enter an equivalent quantity of land elsewhere within the Territory." S.Rep. No. 228 at 4.[17] The Act of June 21, 1860, followed, in which the United States Congress accepted the offer of the heirs of Baca and allowed them "to select instead of the land claimed by them, an equal quantity of vacant land,[18] not mineral, in the Territory of New Mexico." The heirs of Baca did select such land, part of which was Baca Grant No. 4, and obtained title from the United States by following the procedures prescribed by the Act of June 21, 1860. The result was a grant of lands in which no private rights had ever been recognized under the laws of Spain or Mexico and a waiver of a claim to other lands under which such rights could have been asserted by the claimants. *See Wise v. Watts*, 239 F. 207, 225–27 (9th Cir.1917), *cert. denied*, 244 U.S. 661, 37 S.Ct. 745, 61 L.Ed. 1376 (1917) (discussing title to Baca Grant No. 3, obtained under the same circumstances as Baca Grant No. 4).

The grant of lands, including Baca Grant No. 4, not subject to rights under the laws of Spain and Mexico in return for such waiver was not an abrogation of treaty rights as AWDI contends, but rather a resolution of competing claims well within the ambit of congressional authority. *See Sandoval*, 167 U.S. at 290, 17 S.Ct. at 873 ("The mode in which private rights of property may be se-

---

tion of the issues before us whether title to Vegas Grandes was derived under Spanish law, Mexican law, or some combination of the two.

**16.** In *Ely Real Estate & Investment Co. v. Watts*, 262 F. 721, 721 (9th Cir.1920), *cert. denied*, 255 U.S. 564, 41 S.Ct. 374, 65 L.Ed. 788 (1921), the court referred to the effect of the Act of June 21, 1860, as "granting to the heirs of Luis Maria Cabeza de Baca the right to select lands *in the public domain* in lieu of the Las Vegas grant, which they claimed to own." (Emphasis added). *See Lane v. Watts*, 234 U.S. at 539–40, 34 S.Ct. at 972 (Baca Grant No. 3 was segregated from public domain); *Kellogg*, 170 U.S. at 338, 343, 18 S.Ct. at 643, 645 (Baca Grant No. 4 was segregated from public domain).

**17.** *See Lane v. Watts*, 234 U.S. at 541–42, 34 S.Ct. at 973 ("To accommodate conflicting claims and at the instance of the Government the Baca claimants gave up their rights to a definite tract of land, and ... the Government therefore would naturally make provision for the location of the substituted land as expeditiously as possible and without expense to the Baca heirs").

**18.** "Vacant land" necessarily referred to land not subject to "claims to lands under the laws, usages, and customs of Spain and Mexico," for lands in the latter category previously had been withdrawn from disposal pending final action by Congress on such claims. Act of July 22, 1854, § 8, 10 Stat. at 308, 309.

cured, and the obligations imposed upon the United States, by treaties, fulfilled, belongs to the political department of the government to provide."); *Tameling,* 93 U.S. at 661. The Act of June 21, 1860, itself contains no suggestion that the grant of Baca Grant No. 4 involved any intent to create rights other than those incident to any conveyance of lands from the public domain of the United States to a private citizen. *Cf. United States v. Roselius,* 56 U.S. (15 How.) 31, 34, 14 L.Ed. 587 (1853) (confirmation of doubtful claim by Congress on certain terms and acceptance of those terms by claimant adjusts the claim on the footing of compromise and forecloses judicial review).

AWDI argues, however, that references by Congress to "confirmation" of the claim of the Baca heirs to the Vegas Grandes reflect an intent that the rights acquired by the Baca heirs in the substituted lands, including Baca Grant No. 4, were the same rights incident to their claim under Spanish or Mexican law to the Vegas Grandes. This argument is not well taken. The surveyor general of the United States did indeed recommend that the title of the Baca heirs to the Vegas Grandes be confirmed and the disputes between the two sets of claimants be resolved in court. Instead, however, pursuant to agreement, the Baca heirs waived that title in return for the right to obtain other lands from the United States. The surveyor general's recommended confirmation of the original title and Congress's ensuing confirmation of claim 20 both related to rights in the Vegas Grandes but suggested nothing about the nature of the title to be acquired

from the United States by a compromise grant of other lands in that sovereign's public domain.[19]

AWDI also relies on case authority to support its argument that title to the alternative selected lands does not lose its original character as derived under the laws of Spain or Mexico. AWDI refers us to *Henshaw v. Bissell,* 85 U.S. (18 Wall.) 255, 21 L.Ed. 835 *Board of County Comm'rs of County of Pueblo v. Central Colo. Improvement Co.,* 2 Colo. 628 (1874) (*Nolan I*); *rev'd by Central Colo. Improvement Co. v. Board of Comm'rs,* 95 U.S. 259, 24 L.Ed. 495 (1877) (*Nolan II*). *Henshaw* referred to Mexican law in part to determine the better title under conflicting United States patents issued upon a confirmation of grants made by the Mexican government as floating grants within a general tract large enough to satisfy both. *Nolan I* and *Nolan II* establish that when a Mexican land grant is confirmed to less than all of the lands located within the boundaries of the original grant, title relates back to and is grounded upon the laws of Mexico. In the present case, the claim confirmed to the Baca heirs was their claim to the Vegas Grandes. The Baca heirs waived that claim and accepted a grant from the United States to public domain lands not within the boundaries of any Mexican land grant. Neither *Henshaw* nor the opinions in *Nolan I* and *Nolan II* speak to this issue. For the reasons previously expressed, we hold that title to the Baca Grant No. 4 did not derive from the Mexican government or its Spanish predecessor.[20]

19. AWDI in its reply brief in this court also refers to the use of the term "confirmation" in the Act of June 11, 1864, Ch. 123, 13 Stat. 125 (1864), which provides for selection of substitute lands by the Baca heirs for one of the parcels selected by them under the Act of June 21, 1860. The Act of June 11, 1864, refers to the lands first selected by the Baca heirs as "bodies of land confirmed to them" by the 1860 act, then refers to one of the substitute parcels as "confirmed to said heirs as aforesaid," and finally refers to the selection of substitute lands under the Act of June 11, 1864, as "confirmed to the said heirs of the said Luis Maria Baca." AWDI argues that the language of confirmation supports its argument that title to the substitute tracts is derived under Spanish or Mexican law. As previously noted, however, it was the claim of the Baca heirs to the Vegas Grandes that was confirmed, and that claim was

waived in order to resolve a conflicting claim by the Town of Las Vegas. We are unable to ascribe to the general references to confirmation in the Act of June 11, 1864, the significance attached to them by AWDI.

20. AWDI also notes that "Baca Location No. 1," one of the five parcels selected by the Baca heirs under the Act of June 21, 1860, was referred to as a "Spanish Land Grant" in House and Senate reports concerning legislation on land exchanges in 1990. *See* H.R.Rep. No. 783, 101st Cong., 2d Sess., pt. 1, at 3 (1990) and S.Rep. No. 538, 101st Cong., 2d Sess. 7 (1990), Legislative History of Baca Location No. 1 Land Acquisition and Study Act of 1990, Pub.L. No. 101–556, 104 Stat. 2762 (1990). Certainly, rights to the parcels selected by the Baca heirs arose indirectly from Spanish

### C. *The Claim Under the Act of June 21, 1860*

AWDI asserts a supplemental or alternative claim to ownership of all ground water underlying Baca Grant No. 4 based on the language of the Act of June 21, 1860. As earlier discussed, section 3 of that Act "confirmed" certain private land claims in the Territory of New Mexico, including the competing claims of the Baca heirs and the Town of Las Vegas to the Vegas Grandes, as recommended for confirmation by the surveyor general. In section 4 of the Act, Congress provided "[t]hat the foregoing confirmation shall only be construed as quit-claims or relinquishments, on the part of the United States, and shall not affect the adverse rights of any other person or persons whomsoever." AWDI relies on this language of quit claim or relinquishment as conveying to the Baca heirs all rights of the United States in the lands selected by them in return for waiver of their claim to the Vegas Grandes. Such rights, according to this argument, included all rights to water underlying Baca Grant No. 4.

As earlier noted, however, the Act of June 21, 1860, did not confirm a claim of the Baca heirs to Baca Grant No. 4. They had no such claim. Instead, pursuant to section 6 of that Act and the legislation previously discussed, the Baca heirs were authorized to select alternative lands not within the boundary of the Vegas Grandes in return for waiver of their claim to the Vegas Grandes. Section 4 of the Act, quit claiming or relinquishing rights of the United States to confirmed claims, had no application to the substitute lands. AWDI's reliance on *Henshaw v. Bissell*, 85 U.S. (18 Wall.) 255, 21 L.Ed. 835 (1873), and language in *Shaw v. Kellogg*, 170 U.S. 312, 331, 18 S.Ct. 632, 640, 42 L.Ed. 1050 (1898), is misplaced. Those cases contain language supporting the proposition that confirmation of claims under the Act of June 21, 1860, effected relinquishment of all rights of the United States to the premises covered by the claims. This proposition, based on section 4 of the Act, has no application to the substitute lands in the public domain, including Baca Grant No. 4, selected by the Baca heirs in return for waiver of their claim to the Vegas Grandes, the tract to which their claim pertained.

Principles of construction militate against AWDI's arguments as well. Land grants are construed favorably to the United States government, and nothing passes except what is conveyed in clear and explicit language. *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 59, 103 S.Ct. 2218, 2231, 76 L.Ed.2d 400 (1983) (lands acquired under Stock Raising Homestead Act of 1916 do not include gravel deposits); *Andrus v. Charlestone Stone Prod. Co.*, 436 U.S. 604, 617, 98 S.Ct. 2002, 2009–10, 56 L.Ed.2d 570 (1978) (water is not a valuable mineral subject to location under Federal Mining Law of 1872); *United States v. Union Pac. R.R. Co.*, 353 U.S. 112, 116, 77 S.Ct. 685, 687, 1 L.Ed.2d 693 (1957) (right of way granted to railroad did not include mineral rights); *Caldwell v. United States*, 250 U.S. 14, 20–21, 39 S.Ct. 397, 398–99, 63 L.Ed. 816 (1919) (right granted by statute to railroad to take timber necessary for construction did not extend to "tie slash"—tops of trees not usable for making ties). Any doubts are to be resolved in favor of the government and not against it, *Western Nuclear, Inc.*, 462 U.S. at 59, 103 S.Ct. at 2231; *Andrus*, 436 U.S. at 617, 98 S.Ct. at 2009–10; *United States v. Union Pac.*, 353 U.S. at 116, 77 S.Ct. at 687; *Caldwell*, 250 U.S. at 20–21, 39 S.Ct. at 398–99, as are any inferences, *Caldwell*, 250 U.S. at 20, 39 S.Ct. at 398. The rule of narrow construction of federal land grants has been applied with particular vigor with respect to water where determination that a grant carries rights to water would create inconsistencies with the water right system that has been based on local law and custom. *See Andrus*, 436 U.S.

---

or Mexican land grants for the Vegas Grandes and the resolution of conflicting claims to the Vegas Grandes under such grants. Under these circumstances we attach no weighty significance to the references to "Baca Location No. 1" as a Spanish Land Grant in the legislative reports.

Furthermore, because title to the Baca Grant No. 4 is not based on confirmation of a Spanish or Mexican grant of such lands, we need not and do not express any opinion on the incidents of title that is so based.

at 615–17, 98 S.Ct. at 2008–10.[21]

Nothing in the Act of June 21, 1860, suggests that the land to be received by the Baca heirs by selection from the public domain in exchange for relinquishment of their claim under Spanish or Mexican law to the Vegas Grandes was to have any incidents peculiar to claims derived under the law of those sovereigns. The Act contains no mention whatsoever of rights to water underlying the lands to be selected.[22] There is no basis in the Act of June 21, 1860, to support a construction that the Baca heirs acquired any rights that would have been recognized under Spanish or Mexican law to substituted lands selected by them in return for waiver of their claim to the Vegas Grandes.[23]

We hold that AWDI's argument that it acquired rights to water underlying Baca Grant No. 4 based on the terms of the Act of June 21, 1860, is not well founded.

## III. Challenges to the Determination that Water Sought to be Withdrawn is Tributary

At the time of trial, AWDI's sole remaining claim for a right to withdraw 200,000 acre feet of water annually from wells on lands owned or claimed by it was contained in that part of its amended application seeking a determination of rights to nontributary ground water under section 37–92–203(1), 15 C.R.S. (1990). The trial court determined that the water did not meet the statutory definition of nontributary ground water in section 37–90–103(10.5), 15 C.R.S. (1990), and therefore denied the claim. The court found that the water was tributary not by a mere preponderance of the evidence but "beyond a reasonable doubt." [24]

Section 37–90–103(10.5) defines nontributary ground water, in relevant part, as follows:

'Nontributary Ground Water' means that ground water, located outside the boundaries of any designated ground water basins[25] in existence on January 1, 1985, the withdrawal of which will not, within one hundred years, deplete the flow of a natural stream, including a natural stream as defined in sections 37–82–101(2) and 37–92–102(1)(b), at an annual rate greater than one-tenth of one percent of the annual rate of withdrawal. The determination of

---

21. AWDI contends that local law and custom governed the extent of water rights appurtenant to lands conveyed by the United States when the Baca heirs obtained title to Baca Grant No. 4 in 1864. *See generally California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 154–55, 55 S.Ct. 725, 727–28, 79 L.Ed. 1356 (1935); *State v. S.W. Colo. Water Cons. Dist.*, 671 P.2d 1294, 1304–07 (Colo.1983) *cert. denied*, *Young v. S.W. Colo. Water Cons. Dist.*, 466 U.S. 944, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984). AWDI argues that local law and custom in the San Luis Valley at the relevant time presents a genuine issue of material fact precluding summary judgment. As we recognized in *Coffin v. Left Hand Ditch Co.*, 6 Colo. 443, 446 (1882), however, the doctrine of priority of appropriation with respect to tributary water governed in Colorado "from the date of the earliest appropriations of water within the boundaries of the state."

We believe that at least after Colorado was organized as a territory on February 28, 1861, the proper inquiry concerning local law and custom is to be made on a territory-wide basis. The use of the term "law" indicates that we should look to the body empowered to make law—here the territorial legislature—and suggests that "custom" should be examined within that same territorial compass. *Coffin* therefore controls, and we find it unnecessary to inquire into the possibility of differing custom in particular parts of the territory or state.

22. For general principles concerning the interrelation of federal and state law concerning acquisition of rights to water, *see, e.g., S.W. Colo. Water Cons. Dist.*, 671 P.2d at 1304–18; *United States v. City and County of Denver*, 656 P.2d 1 (Colo.1983); *Coffin*, 6 Colo. 443.

23. For the foregoing reasons, we also are unpersuaded by AWDI's suggestion that by reason of the obligations of the United States under the Treaty of Guadalupe Hidalgo and by an attempted analogy to the doctrine of federal reserved water rights, *see United States v. City and County of Denver*, 656 P.2d 1, the Baca heirs were granted by implication a right to water underlying Baca Grant No. 4.

24. The state engineer had issued a determination pursuant to § 37–92–302(2), 15 C.R.S. (1993 Supp.), that the water was tributary, and the trial court took note of the rebuttable presumption created by that determination. *See* § 37–92–305(6), 15 C.R.S. (1993 Supp.).

25. The ground water at issue is located outside the boundary of any designated ground water basins.

whether ground water is nontributary shall be based on aquifer conditions existing at the time of permit application. . . .

Based on this definition, the water sought by AWDI was nontributary ground water only if within one hundred years the withdrawal at the rate of 200,000 acre feet per year would not deplete the flow of a natural stream at an annual rate of one-tenth of one percent of that amount, or 200 acre feet per annum. The trial court found that the effect of the withdrawals on three sets of natural streams would exceed the statutory standard. First, the court found that depletion to the surface flows of the Rio Grande River and San Luis Creek alone would be approximately 7,400 acre feet per annum. Second, the court found that depletions of approximately 3,600 acre feet per annum would result to the surface flow of Big Spring Creek and that depletions to many other streams in the Closed Basin would occur in amounts not quantified by the evidence. Additionally, the trial court found that there would also be depletions to the Closed Basin's unconfined aquifer, which the court concluded to be part of the water of a natural stream. We first address the findings concerning the effect of AWDI's proposed pumping on surface streams and then the issues relating to the effect on the unconfined aquifer.[26] We conclude this section by considering AWDI's challenge to the partial summary judgment order precluding it from challenging the means of diversion of the Closed Basin Project.

A. *Whether the Trial Court Properly Determined the Effect of AWDI's Proposed Pumping on Surface Streams*

■ The trial court's determinations of the effects of the proposed withdrawals on the Rio Grande River, San Luis Creek, Big Spring Creek, and other surface streams are findings of fact. As such, they will not be disturbed on appeal unless wholly unsupported by the evidence. *Board of County Comm'rs v. Upper Gunnison River Water Cons. Dist.*, 838 P.2d 840, 847 (Colo.1992); *People v. City of Thornton*, 775 P.2d 11, 19 (Colo.1989).

The trial court was presented with extensive evidence, through expert testimony and voluminous exhibits, concerning the geologic and hydrologic characteristics of the Valley and of the Closed Basin in particular. The evidence established, and the trial court found, that underlying the lands in the Valley are two aquifers having different hydrologic properties and generally acting as separate hydrologic units. Separating them is a group of clay layers referred to as the blue clay series. The upper aquifer, called the unconfined aquifer, consists of coarse materials with relatively high hydraulic conductivities, and is situated above the blue clays, which range in depth from 35 feet on the west side of the Valley to 125 feet on the east. Most of the irrigation wells in the Valley are completed in this aquifer.[27] The lower aquifer is located below the blue clays. Although hydrologically connected at various points, the two aquifers have been separately administered by the state engineer for well permit purposes. The extent of the hydraulic connection is sufficiently slight that water in the confined aquifer is maintained under artesian pressure. The artesian condition results from a recharge of the confined aquifer by waters entering the aquifer at higher elevations at the edges of the Valley and the limited permeability of the blue clays separating the two aquifers.

The evidence concerning the effects to be produced by AWDI's proposed withdrawals

---

26. AWDI's theory of nontributariness was premised principally on several related contentions, all of which were properly rejected by the trial court. First, it argued that whether ground water is nontributary is to be determined solely by reference to the effect of pumping on the surface flow of natural streams without regard to the effect on ground water tributary to such streams. Second, it contended that there was no significant hydraulic connection between the surface streams in the Closed Basin and the underlying aquifers so that depletion of the unconfined aquifer would not deplete the surface flow or cause greater loss through streambed leakage than

would otherwise occur. AWDI also contended that the streams in the Closed Basin lose their character as natural streams when they reach the Closed Basin. As discussed herein, the trial court rejected these premises based on determinations of fact from conflicting evidence, correct rulings on the law, or a combination of the two.

27. AWDI's proposed wells are to be perforated at depths between 200 and 2,500 feet and therefore are to be completed in the lower, confined aquifer.

of water was sharply conflicting in many respects. Each side attempted to develop a comprehensive geologic and hydrologic framework for use in predicting the movement of water within the San Luis Valley as a result of such withdrawals. For this purpose AWDI and the objectors utilized complex ground water flow computer models, the objectors' model having been developed by the Colorado state engineer. By introducing into the models certain data as described to the court through expert testimony, each side attempted to demonstrate the effect of the proposed withdrawals on surface streams and the unconfined aquifer.

In general, the court found the evidence presented by the objectors and utilized in operating their computer model more credible than that of AWDI.[28] In particular, the court made the critical finding that the ground water in the unconfined aquifer "is in hydraulic connection with most surface streams in the San Luis Valley and their alluvium for all or portions of most years."[29] As a result, the level of the water table in the unconfined aquifer influences gain or loss to the streams. On another critical factual issue, the trial court found that the values used by AWDI for streambed conductance, which expresses the rate at which a stream will lose water to the underlying aquifer, were not credible; AWDI's data greatly underestimated loss of water through streambed leakage. The court also found that AWDI's evapotranspiration data and use of that data in its computer model materially overstated the potential for reducing loss of water by evapotranspiration by lowering the water table through pumping and thus eliminating vegetation. These are examples of some of the more important factual findings that undermined the credibility of the results predicted by the use of AWDI's computer model.

The trial court also found that the State's model was originally created for administrative purposes and was "far more extensive and thorough" than that of AWDI. The court found that while not purporting to be

able "to predict with exact precision the quantity and location of stream depletions" to be caused by AWDI's proposed pumping, the State's model was adequate for a determination of whether depletion to certain streams would exceed the statutory standard in the definition of nontributary water. The 7,400 acre feet per annum depletive effect on the Rio Grande River and San Luis Creek was directly predicted by the State's model and provided the basis for the trial court's finding that this effect was inconsistent with the statutory definition of nontributary water.

In addition, the State's model predicted the locations where the water level in the unconfined aquifer would be drawn down by AWDI's proposed pumping. Based on expert testimony that Big Spring Creek was in hydraulic connection with the unconfined aquifer, the computer model prediction that the effect of AWDI's proposed pumping would reduce the water level in that aquifer to a particular extent, and an expert's testimony concerning the effect of such a water level reduction on Big Spring Creek, the trial court found that the creek would be depleted by approximately 3,600 acre feet per year by the proposed pumping, a reduction in itself sufficient to defeat AWDI's claim that the water it sought to withdraw was nontributary. The trial court also found that the lowering of the water level in the unconfined aquifer would adversely affect other natural streams even though such effects could not be precisely quantified because those streams were not included in the computer model.

All of the trial court's findings were based on evidence in the record and will not be overturned. *See, e.g., Upper Gunnison River*, 838 P.2d at 847.

B. *Whether the Trial Court Properly Determined the Nature of the Unconfined Aquifer and the Effect of AWDI's Proposed Pumping on that Aquifer*

The trial court also determined that the unconfined aquifer was part of a natural

---

**28.** After an extensive review of the evidence concerning AWDI's computer model and the data used in operating it the trial court found "that the opinions of [AWDI's] experts, based upon its model, are not credible."

**29.** AWDI acknowledges that there is a hydraulic connection between the surface streams and the unconfined aquifer with respect to the property near Villa Grove. The issue here relates only to the Baca Grant No. 4 and adjacent lands.

stream, with the result that the depletive effects of AWDI's proposed withdrawals on that aquifer must be taken into account as well in determining whether the water to be withdrawn is nontributary. We agree.

Under Article XVI, Sections 5 and 6, of the Colorado Constitution, the water of every natural stream is declared to be the property of the public and subject to appropriation for beneficial use. The manner of implementation of that right has been delineated by the Water Right Determination and Administration Act of 1969, §§ 37–92–101 to –602, 15 C.R.S. (1990 & 1993 Supp.), and extensive case law preceding and following that Act. The right to appropriate water of every natural stream extends to waters tributary to a natural surface stream. § 37–92–102, 15 C.R.S. (1990); *State v. S.W. Colo. Water Cons. Dist.*, 671 P.2d 1294, 1308 (Colo.1983); *Whitten v. Coit*, 153 Colo. 157, 385 P.2d 131 (1963).

Nontributary ground water is subject to disposition by the General Assembly in exercise of its plenary power to develop a system of law governing acquisition of rights in this resource. *See S.W. Colo. Water Cons. Dist.*, 671 P.2d at 1304–18 (describing interrelation of federal and state law concerning the acquisition of rights to water). In exercise of that power, the General Assembly has provided for judicial determination of rights to nontributary ground water outside of designated ground water basins, § 37–92–203(1), 15 C.R.S. (1990), and has established standards and procedures concerning acquisition of such rights, § 37–90–137, 15 C.R.S. (1990 & 1993 Supp.). The right to withdraw nontributary ground water is based on ownership of the overlying land, § 37–90–102(2), 15 C.R.S. (1990); § 37–90–137(4), 15 C.R.S. (1990 & 1993 Supp.), rather than the doctrine of prior appropriation applicable to tributary water.

Because of the two separate systems for acquisition of rights in water in and tributary to natural streams and nontributary ground water it became useful to define the distinction between these two resources. The present case implicates two sets of statutes establishing that distinction. The one is a pair of statutes having particular application to stream systems arising and terminating in Colorado. The other is the statute defining "nontributary ground water."

In 1979, the General Assembly enacted essentially identical statutes,[30] as set forth in Ch. 346, secs. 1, 4, § 37–82–101(2), § 37–92–102(1)(b), 1979 Colo.Sess.Laws 1366, 1366, 1367–68, which provide:

A stream system which arises as a natural surface stream and, as a natural or man-induced phenomenon, terminates within the state of Colorado through naturally occurring evaporation and transpiration of its waters, together with its underflow and tributary waters, is a natural surface stream subject to appropriation. . . .

We sometimes refer to sections 37–82–101(2) and 37–92–102(1)(b) collectively as the "natural surface stream legislation."

In 1985, the General Assembly adopted the definition of nontributary ground water in effect at the time AWDI asserted its claim and continuing to the present. § 37–90–103(10.5), 15 C.R.S. (1990). That statute appears earlier in this opinion at page 34 and specifically includes the natural streams defined in the natural surface stream legislation among the natural streams to be considered in applying the statutory test.

Relying on the definition of "natural surface stream" adopted in the natural surface stream legislation, which includes underflow and tributary waters, the trial court found the streams flowing into the Closed Basin and the unconfined aquifer into which those streams flow to be natural streams. AWDI argues, first, that the natural surface stream legislation is special legislation prohibited by Article V, Section 25, of the Colorado Constitution. AWDI also asserts that the unconfined aquifer is not part of a natural stream

---

**30.** The only difference is that § 37–82–101(2) concludes by reference to "appropriation as provided in subsection (1) of this section," whereas § 37–92–102(1)(b) concludes by reference to "appropriation as provided in paragraph (a) of this subsection (1)." Each of the subsections to which reference is made in turn makes reference to the constitutional right of appropriation, although the language of the subsections is not identical.

within the meaning of the statute defining nontributary ground water. In any event, AWDI argues, the trial court's conclusion that the water AWDI seeks to withdraw does not satisfy the statutory standard for nontributary ground water cannot be sustained because the court made no findings concerning relevant aquifer conditions existing at the time of the permit application, as is necessary to apply the definition of nontributary ground water under section 37–10–103(10.5). We address these issues in the order stated.

### 1. Challenge to Natural Stream Legislation as Special Legislation

AWDI argues that the trial court erred in granting the objectors' motion for partial summary judgment declaring the natural surface stream legislation to be consistent with the constitutional prohibition of special legislation. AWDI contends, as it did before the trial court, that sections 37–82–101(2) and 37–92–102(1)(b), 15 C.R.S. (1990), constitute special legislation in violation of Article V, Section 25, of the Colorado Constitution. It asserts that these two statutes constitute special legislation because they apply only to stream systems in the Closed Basin and were intended to preclude the factual determination as to nontributariness that would otherwise be necessary in determining whether ground water in that basin is subject to the doctrine of prior appropriation applicable to tributary water rather than to allocation by landownership, the statutory basis for allocating nontributary ground water outside designated ground water basins. See § 37–90–102(2), 15 C.R.S. (1990); § 37–90–137(4), 15 C.R.S. (1990 & 1993 Supp.).

■ Article V, Section 25, of the Colorado Constitution prohibits the General Assembly from enacting special legislation. The relevant portion of Article V, Section 25, states simply, "where a general law can be made applicable no special law shall be enacted."[31] As we stated in *Curtiss v. GSX Corp. of Colorado*, 774 P.2d 873 (Colo.1989),

> [t]his constitutional prohibition is directed at "legislation that applies to some classes

but not to others without a reasonable basis for distinguishing between them, or legislation that exempts some members of a class from coverage [of the general law] without a reasonable basis for the exemption."

*Id.* at 876 (quoting *City of Montrose v. Public Utilities Comm'n,* 732 P.2d 1181, 1190 (Colo.1987)). A law does not violate the constitutional prohibition against special legislation if it is "general and uniform in its operation upon all in like situation." *Curtiss,* 774 P.2d at 876 (quoting *McCarty v. Goldstein,* 151 Colo. 154, 158, 376 P.2d 691, 692–93 (1962)); *Rifle Potato Growers Ass'n v. Smith,* 78 Colo. 171, 176, 240 P. 937, 939 (1925); *People v. Earl,* 42 Colo. 238, 264, 94 P. 294, 302 (1908).

■ The statutes in question here provide that stream systems that terminate in Colorado are natural surface streams subject to appropriation. We regard this simply as recognition that such stream systems are natural streams within the meaning of Article XVI, Sections 5 and 6, of the Colorado Constitution and therefore subject to the constitutional right of appropriation. The legislature had a reasonable basis to address this particular class of streams and clarify the manner of obtaining rights to water in such stream systems.

The statutes satisfy the requirement that they be general and of uniform application. By their terms they apply to all stream systems in the state of Colorado that arise as natural surface streams and terminate in Colorado. The statutes are not limited to apply only to specific streams or specific geographic areas. When adopting the legislation, the legislature itself was aware of at least one other area in the state of Colorado to which the statutes would apply. *See* Senate Floor Debate on S.B. 481 (April 25, 1979).

Although the legislature was apparently aware of just two geographic regions that would be affected by the legislation, the number of class members known to be affected by the statutory criteria at the time of enactment is not determinative in deciding wheth-

---

**31.** Article V, Section 25, of the Colorado Constitution, also specifically prohibits special laws in

twenty-two express categories, none of which is applicable here.

er the legislation amounts to unconstitutional special legislation. In *Darrow v. People,* 8 Colo. 417, 8 P. 661 (1885), we upheld the constitutionality of legislation that created a superior court in any town or city that had more than 25,000 inhabitants, even though Denver was the only city of that size when the legislation was adopted. In *Darrow,* we stated that

> Denver, it is true, is the only city to which the act at present applies. But the legislature clearly intended to provide for places that may hereafter acquire the population mentioned. The law is general, and is unlimited as to time in its operation. There is nothing unreasonable in the supposition that other towns and cities within the state will eventually contain twenty-five thousand inhabitants.

*Darrow,* 8 Colo. at 418–19, 8 P. at 662; *cf. In re Interrogatories,* 146 Colo. 233, 361 P.2d 350 (1961) (a bill authorizing annexation of a town by a city under circumstances unique to one location and providing for automatic repeal of annexation authority shortly after enactment was unconstitutional as special legislation). Like the legislation at issue in *Darrow,* the natural surface stream legislation has an indefinite period of application. Analogous to *Darrow,* there is nothing unreasonable in the supposition that with the development and refinement of knowledge of the geography and hydrology of the state, it may be learned that there are other stream systems that arise as natural surface streams and terminate in Colorado. Therefore, in the future, this legislation may be found to apply to such other streams.

Because the two statutes are of general and uniform applicability, they do not constitute special legislation in violation of Article V, Section 25, of the Colorado Constitution. Accordingly, the trial court's partial summary judgment ruling will be upheld.[32]

### 2. *Inclusion of Unconfined Aquifer in Definition of Natural Stream*

The trial court concluded as a matter of law that "the unconfined aquifer is water of a natural stream," and that the proposed pumping of 200,000 acre feet per annum would deplete the flow of that stream as well as other natural streams in the San Luis Valley to a greater extent than allowable in order to satisfy the criteria in the definition of nontributary ground water in section 37–90–103(10.5).

■ AWDI asserts first that the unconfined aquifer is not a natural stream within the meaning of section 37–90–103(10.5) because it does not fit the definition of "natural stream" in section 37–87–102(1)(b), 15 C.R.S. (1990). This argument has no merit.

Section 37–87–102(1)(b) provides:

*As used in this article,* unless the context otherwise requires:

> .     .     .     .     .

> (b) "Natural stream" means a place on the surface of the earth where water naturally flows regularly or intermittently with a perceptible current between observable banks, although the location of such banks may vary under different conditions.

(Emphasis added.) The "article" referred to in the foregoing definition is Article 87, entitled "Reservoirs." By its own terms, the definition does not apply to section 37–90–103(10.5), which appears in a separate article 90, captioned "Underground Water." Also, section 37–90–103(10.5) specifically includes within the meaning of "natural stream" "a natural stream as defined in sections 37–82–101(2) and 37–92–102(1)(b)." The trial court found that the unconfined aquifer falls within these definitions as "a stream system which arises as a natural surface stream which terminates within the state, together with its associated underflow and tributary water."

AWDI also argues that the amount of surface stream depletion alone determines whether water is nontributary within the meaning of section 37–90–103(10.5). This is incorrect. That section specifically refers to sections 37–82–101(2) and 37–92–102(1)(b) as included within the definition of natural streams. Those sections in turn refer to "a

---

**32.** Summary judgment was consistent with the principles governing the availability of such relief. *See supra* at 360.

natural surface stream ... together with its underflow and tributary waters." Clearly then, the underflow and tributary waters of streams described in the natural stream legislation are included as part of the natural streams referred to in section 37–90–103(10.-5), and the effect on such underflow and tributary waters must be considered in determining whether ground water to be withdrawn is nontributary.

AWDI also challenges factual findings upon which the trial court relied in determining that the unconfined aquifer constitutes associated "underflow and tributary water" of a natural surface stream and therefore by definition is part of the natural surface stream. *See* §§ 37–82–101(2) and 37–92–102(1)(b). Specifically, AWDI contends that its evidence concerning the lack of hydraulic connection between the unconfined aquifer and surface streams was more weighty and credible than that of the objectors. Similarly, AWDI contends that its evidence concerning streambed conductance, which affects the movement of water into and out of the subsurface surrounding a stream is more persuasive. Our review of the record, however, reveals ample evidence supporting the trial court's findings on these matters. Issues of credibility are to be resolved by the trial court. Consequently, the findings will not be disturbed on appeal. *See Upper Gunnison River*, 838 P.2d at 847.[33]

33. The trial court also found that without regard to the natural stream legislation, the unconfined aquifer is a natural stream within the meaning of the statutory and case law delineating the reach of the constitutional right of appropriation. AWDI has not challenged that analysis except as implicit in its factual challenge to the trial court's finding of a hydraulic connection between the unconfined aquifer and the surface streams. It is therefore unnecessary to address that analysis except to say that we agree that the statutory definition of nontributary ground water must be construed to be exclusive of those waters subject to the constitutional right of appropriation. *See Whitten v. Coit*, 153 Colo. 157, 385 P.2d 131 (1963) (doctrine of prior appropriation is not applicable to underground waters that are not tributary to any natural stream). There is no suggestion that the trial court's construction was not fully consistent with that principle.

34. The significance of this dispute relates to whether the unconfined aquifer, under "aquifer

For the foregoing reasons we uphold the trial court's determination that the unconfined aquifer in the Closed Basin is part of a natural surface stream within the meaning of section 37–90–103(10.5).

### 3. Requirement of Determination of Existing Aquifer Conditions at the Time of Permit Application

Section 37–90–103(10.5) requires that a determination that ground water is nontributary "shall be based on aquifer conditions existing at the time of permit application. . . ." AWDI asserts that the trial court's order is not so based and that therefore the judgment must be reversed and remanded with directions to apply the statutory standard.

AWDI did not present evidence directed at the conditions of the aquifer as they existed in 1986 when AWDI first filed its permit application. Rather, an expert witness for AWDI testified that conditions during the 1970s were representative of conditions at the time of the application. The objectors introduced evidence that conditions in the 1970s were not representative but that such period was untypically dry.[34] The trial court held that it need not resolve this controversy because it was satisfied, applying the statutory standard, "that the ground water sought by [AWDI] is tributary even if the period 1970–1979, or any period thereafter is used."[35] Again, the evidence was conflicting,

conditions existing at the time of the permit application" would be and remain in hydraulic connection with the surface streams. Absent such a connection, the unconfined aquifer arguably would not be part of a natural stream and any effect of AWDI's proposed withdrawals on water level in that aquifer would not be relevant to determination of nontributariness as defined in § 37–90–103(10.5).

35. AWDI also argues that the trial court erred in adopting a speculative value for Closed Basin Project production, rather than the lower amount actually produced during the 1980s, by relying on the State's computer model. As the State points out in its brief, however, the Project is conditionally decreed 117,000 acre feet per year. The State used 75,000 acre feet per year in running its model as an estimate of probable sustained production based on the evidence concerning other constraints on production included in the Closed Basin Project decree. We cannot conclude that the trial court erred in implicitly

the court made findings resolving the material conflicts, and therefore the findings of the trial court must be sustained on review.

### C. Whether the Trial Court Properly Precluded Challenge to Means of Diversion of Closed Basin Project

AWDI argues that the trial court erred in granting partial summary judgment precluding AWDI from challenging the reasonableness of the means of diversion of wells producing from the unconfined aquifer on the basis of a water right decreed for the Closed Basin Project. We do not find it necessary to address this question on the merits.

The Closed Basin Project is a federal reclamation project that was authorized by the Reclamation Project Authorization Act of 1972.[36] The project was designed to withdraw water from the unconfined aquifer of the Closed Basin and deliver the water to the Rio Grande River. Under normal conditions, water that flows into the basin is collected in a sump area that is separated from the Rio Grande River drainage by a natural hydraulic barrier at the southern boundary of the Closed Basin. Once trapped there, much of the water is lost to evaporation and evapotranspiration. See generally Closed Basin Landowners Ass'n v. Rio Grande Water Cons. Dist., 734 P.2d 627 (Colo.1987).

> The goal of the Closed Basin project is to lower the water table in the sump area by approximately two feet through the construction and operation of over one-hundred shallow wells, and to reduce water losses to evaporation and evapotranspiration. Water salvaged from the sump area

is to be delivered to the Rio Grande River to help meet Colorado's obligations to New Mexico and Texas under the Rio Grande Compact. See Rio Grande Compact, P.L. No. 96, 53 Stat. 785 (1939); § 37–66–101, 15 C.R.S. (1973).

Id. at 629.

In December of 1972, Rio Grande Water Conservation District, the local sponsoring entity for this federal project, applied for determination of a conditional water right. In April 1980, in case W–3038, the District Court for Water Division 3 granted the application and decreed a conditional water right to withdraw 117,000 acre feet of water per year from 129 shallow wells situated on over 100,000 acres of lands. The wells would tap the unconfined aquifer in the Closed Basin. See generally Closed Basin, 734 P.2d at 629–31.

In the trial court, AWDI contended that in considering whether the ground water it sought to withdraw by its proposed wells is available for appropriation under its tributary claim and whether withdrawals would materially injure the vested rights of others, see § 37–90–137(2), 15 C.R.S. (1993 Supp.), the court must address whether the Closed Basin wells, which are limited by decree to withdrawals from the unconfined aquifer, constitute a reasonable means of diversion. See § 37–92–102(2)(b) 15 C.R.S. (1990); Alamosa–LaJara, 674 P.2d at 934–35; City of Colorado Springs v. Bender, 148 Colo. 458, 462, 366 P.2d 552, 555 (1961).[37] AWDI's position was that any injury to the Closed Basin Project that might otherwise result from AWDI's proposed pumping should be

---

recognizing that estimated production level as a condition existing at the time of the permit application.

**36.** Pub.L. No. 92–514, 86 Stat. 964 (1972), as amended by Pub.L. No. 96–375, § 6, 94 Stat. 1507 (1980); Pub.L. No. 98–570, 98 Stat. 2941 (1984); and Pub.L. No. 100–516, § 22, 102 Stat. 2566, 2575 (1988).

**37.** The reasonable means of diversion issue, as applied to tributary ground water, was first explained in Bender:

> ... priority of appropriation does not give a right to an inefficient means of diversion, such as a well which reaches to such a shallow

depth into the available water supply that a shortage would occur to such senior even though diversion by others did not deplete the stream below, where there would be an adequate supply for the senior's lawful demand.

The plaintiffs cannot reasonably "command the whole" source of supply merely to facilitate the taking by them of the fraction of the entire flow to which their senior appropriation entitles them. On the other hand, plaintiffs cannot be required to improve their extraction facilities beyond their economic reach, upon a consideration of all the factors involved.

Bender, 148 Colo. at 462, 465, 366 P.2d at 555, 556.

addressed by requiring that the Project wells be deepened to produce water from the confined aquifer. Prior to trial, Rio Grande Water Conservation District moved for partial summary judgment to preclude AWDI from challenging in this proceeding the District's adjudicated water right for the Closed Basin Project. The trial court granted the motion, finding that the doctrine of *res judicata* barred any challenge to the Closed Basin Project decree. The court specifically stated that the applicant was barred from challenging "the reasonableness of the means of diversion established for the well withdrawals decreed in the April 21, 1980 Decree in Case No. W–3038, including the requirement that the depth of the wells be restricted to the unconfined aquifer." On this appeal, AWDI asserts that the court must consider whether the Closed Basin Project's means of diversion is reasonable. We need not reach this question.

The central issue in the case at trial was whether the water sought to be withdrawn was nontributary within the meaning of section 37–90–103(10.5), as claimed by AWDI. Reasonableness of the means of diversion of Closed Basin Project wells had no bearing on that issue, and AWDI did not prevail on its claim. The issue of reasonableness of means of diversion arose in connection with AWDI's tributary claim. AWDI, however, voluntarily dismissed that claim.

In general, a claimant who voluntarily dismisses a claim cannot appeal from the judgment of dismissal, for the judgment cannot be considered adverse as to the one who sought it. *Jensen v. Matthews–Price, M.D.,* 845 P.2d 542, 543 (Colo.App.1992); *accord Unioil, Inc. v. E.F. Hutton & Co., Inc.,* 809 F.2d 548, 555 (9th Cir.1986), *cert. denied,* 484 U.S. 822, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987) & 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987); *LeCompte v. Mr. Chip, Inc.,* 528 F.2d 601, 603 (5th Cir.1976); *see also* 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2376 (1971) (hereinafter "Wright & Miller"). And, as the Sixth Circuit Court of Appeals has observed,

> [e]ven in those rare jurisdictions ... which permit appeal from an order of voluntary

nonsuit where there is a ruling of the court which strikes at the heart of the case and precludes recovery by plaintiff, appeal from such order does not lie to review rulings which do not have the effect of determining the case against plaintiff.

*Management Investors v. United Mine Workers of Am.,* 610 F.2d 384, 394 (6th Cir. 1979) (quoting *Kelly v. Great Atlantic & Pacific Tea Co.,* 86 F.2d 296, 297 (4th Cir. 1936)). *Cf. Harrington v. Anderson,* 87 Colo. 417, 419, 288 P. 1049, 1050 (1930) (we will not as a general rule pass on questions not necessary to the decision); *Olney Springs Drainage Dist. v. Auckland,* 83 Colo. 510, 517, 267 P. 605, 608 (1928) (same). We do not regard the reasonable means of diversion issue as one that strikes at the heart of the tributary claim. In view of AWDI's voluntary dismissal of that claim, we hold that the partial summary judgment on the reasonableness of the means of diversion of the Closed Basin Project wells is not properly reviewable on this appeal.

### IV. Procedural Prejudice

#### A. Whether the Trial Court's Case Management Order and its Implementation Unfairly Prejudiced AWDI

In May of 1990, three and one-half years after the case was filed, the objectors moved for the entry of a case management order that would structure discovery and the pretrial process, including establishment of a discovery schedule and deadlines for amendments to AWDI's water application. In July of 1990 the court entered its case management order. Dates were set before which all motions to amend the application had to be filed, discovery had to be completed, and lists identifying all expected testifying experts, fact witnesses, and exhibits had to be served upon all parties. AWDI was ordered to identify its experts and their proposed testimony as well as its fact witnesses and exhibits before the times the objectors were required to disclose their own witnesses and exhibits.

AWDI now asserts that the case management order and its implementation were unfairly prejudicial. It argues that there was

no justification for the requirement that AWDI identify its witnesses and exhibits before the objectors and that this order unfairly enabled the objectors to conduct discovery "before providing reciprocal information." In addition, AWDI maintains that because the trial court allowed the objectors to introduce late-designated evidence, there was "one-sided" enforcement of the order and that AWDI was unfairly afforded "fewer procedural protections" than the objectors.

■ Generally, pretrial discovery rulings are within the sound discretion of the trial court. *In re Marriage of Mann* 655 P.2d 814, 816 (Colo.1982); *Kerwin v. District Ct.,* 649 P.2d 1086, 1088 (Colo.1982); *Cameron v. District Ct.,* 193 Colo. 286, 289, 565 P.2d 925, 928 (1977); *see also Glisan v. Kurth,* 153 Colo. 102, 107, 384 P.2d 946, 949 (1963) ("to make pre-trial procedure effective, appellate interference with the trial court in this area must be kept at a minimum"). The trial court's decision to prescribe staggered discovery was fully justified by the nature of the issues in this case. AWDI had the burden of proof to establish its alternative claims for tributary or nontributary rights. *See Public Service Co. of Colo. v. Board of Water Works of Pueblo, Colo.,* 831 P.2d 470, 480 (Colo. 1992) (relating to tributary application). The central issue was whether the water to be produced was tributary or nontributary. To evaluate the application it was necessary to understand the complex factual framework concerning the geology and hydrology of the Valley, AWDI's computer model, and the data that would be used in running the model upon which AWDI predicated its claim. It was therefore reasonable to require AWDI to proceed first in order for the objectors to be able to discern the facts AWDI would rely upon to support its application in order to prepare the objectors' own case. Particularly considering the fact that AWDI was allowed to designate rebuttal experts after it had completed discovery from the objectors'

expert witnesses, we cannot say that the trial court's decision to compel AWDI to identify its witnesses and exhibits before the objectors was an abuse of discretion.

■ As for the alleged prejudice to AWDI from the court's "one-sided" implementation of the order, the record does not support this claim. The trial court did modify the management order to allow the objectors to introduce additional evidence, but this evidence did not create unfair surprise. The evidence consisted of another run from a previously introduced computer model showing the predicted results from a particular pumping scenario proposed by AWDI, as well as related testimony, and two demonstrative exhibits that graphically displayed data already available to AWDI. Moreover, the court granted a number of modifications for AWDI itself, including allowing the presentation of rebuttal testimony from a witness not identified until trial was underway.

A trial court has broad discretion in allowing deviations from the terms of pretrial orders. *Murphy v. Colorado Aviation, Inc.,* 41 Colo.App. 237, 241, 588 P.2d 877, 881 (1978), *impliedly overruled on other grounds by Public Service Co. v. District Ct.,* 674 P.2d 383 (Colo.1984); *see C.K.A. v. M.S.,* 695 P.2d 785, 788 (Colo.App.1984) (trial courts have broad discretion in determining whether to allow late endorsement of witnesses not listed in pretrial orders).[38] AWDI has not demonstrated that the trial court abused that discretion.

### B. *Whether the Trial Court's Rulings were Objective*

AWDI asserts that the trial court's rulings were not properly objective. In support of its position, AWDI cites a number of pretrial motions on which the trial court ruled in favor of the objectors by entering precisely the form of order proposed by them. AWDI also points out that the decree entered by the

---

**38.** According to a treatise on the Federal Rules of Civil Procedure:

"Rule 16, ... permitting pretrial procedures, can achieve its purpose of improving the quality of justice only if the pretrial requirements entered at the discretion of the trial court are applied with intelligent flexibility, taking into full consideration the exigencies of each situation. The trial judge must be permitted wide latitude in guiding a case through its preparatory stages."

3 James Wm. Moore et al., *Moore's Federal Practice* ¶ 16.19 (2d ed. 1993) (quoting *Davis v. Duplantis,* 448 F.2d 918, 921 (5th Cir.1971)).

trial court was virtually identical to the objectors' proposed decree.

Adoption of a prevailing party's proposed findings of fact and conclusions of law is not necessarily improper. "[F]indings, if otherwise sufficient, are not weakened or discredited because given in the form submitted by counsel." *Uptime Corp. v. Colorado Research Corp.*, 161 Colo. 87, 93, 420 P.2d 232, 235 (1966). Even those courts that condemn the uncritical adoption of findings prepared by the prevailing party are unwilling to reverse unless the findings themselves are inadequate. *Id.* at 92, 420 P.2d at 235.

> On appeal, the court will assume that the trial judge examined the proposed findings and agreed that they correctly stated the facts as he himself found them to be; otherwise, he would not have adopted them as his own. It is only when the findings themselves are inadequate and do not indicate the basis for the trial court's decision that the judgment will be reversed.

*Id.* at 93, 420 P.2d at 235 (citations omitted). The findings are sufficient and indicate the basis for the trial court's decisions. Therefore, they will be sustained despite the fact that the trial judge adopted the language of the prevailing party's proposed findings and conclusions as his own.

## V. *Excessive and Unwarranted Findings*

AWDI asserts that the trial court's 104 page Findings of Fact, Conclusions of Law, Judgment and Decree contains "a multitude of findings and conclusions irrelevant to the character of the water [as tributary or nontributary]" and requests that these findings and conclusions be excised from the decree. AWDI expresses concern that some of these findings may have a collateral estoppel effect in the event a tributary claim is reasserted in the future. We believe this concern is ill founded.

Collateral estoppel bars relitigation of an issue only under the following conditions:

(1) The issue precluded is identical to an issue actually litigated and necessarily adjudicated in the prior proceeding;

(2) the party against whom estoppel is sought was a party to or was in privity with a party to the prior proceeding;

(3) there was a final judgment on the merits in the prior proceeding; and

(4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding.

*Denver v. Consolidated Ditches Co.*, 807 P.2d 23, 32 (Colo.1991); *accord, e.g., Pomeroy v. Waitkus*, 183 Colo. 344, 350–51, 517 P.2d 396, 399 (1973). To the extent that any of the findings and conclusions of the trial court were not necessarily adjudicated or actually litigated under circumstances where AWDI had a "full and fair opportunity to litigate," they can have no collateral estoppel effect. Once the tributary claim had been dismissed and the injury and mitigation issues eliminated by bifurcation, the issues necessarily adjudicated were those required for determination of whether the water sought to be withdrawn met the statutory definition of nontributary ground water. Therefore, to the extent the trial court's findings and conclusions go beyond those necessary for such a determination, they can have no collateral estoppel effect in future litigation. Under these circumstances, we consider it unnecessary to make a determination of which, if any, of the findings and conclusions are not necessary or to excise any such findings or conclusions from the Findings of Fact, Conclusions of Law, Judgment and Decree.

## VI. *Awards of Attorney Fees, Expenses, and Costs*

Having rejected AWDI's objections to the merits of the trial court's judgment, we now turn to AWDI's objection to the awards of attorney fees, expenses, and costs. A summary of the proceedings leading up to the awards is necessary to an understanding of AWDI's objections.

On September 26, 1991, almost five years after AWDI filed its application and following extensive discovery conducted by both AWDI and the objectors, a pretrial conference was held in preparation for a trial scheduled to begin on October 15, 1991. Prior to the pretrial conference, AWDI's land grant claims had been dismissed by partial sum-

mary judgment. As a result, AWDI's alternative claims for nontributary and tributary water rights were the only remaining bases for its asserted right to withdraw 200,000 acre feet of water per year by its proposed wells. Near the conclusion of the pretrial conference and without prior notice to the objectors, AWDI moved to dismiss, without prejudice, its application for determination of tributary water rights, taking the position that as a result of the trial court's rulings in this action, and other circumstances, it no longer had a "reasonable likelihood of prevailing on the claim." The objectors sought and were granted the opportunity to respond. In briefs, they took the position that if the court exercised its discretion to dismiss under C.R.C.P. 41(a)(2), the order of dismissal must be conditioned upon the award of all fees and expenses incurred by the objectors in defending against the tributary claim. The court held a nonevidentiary hearing and thereafter entered a written order dismissing the tributary claim without prejudice but requiring AWDI to pay to the objectors "all of their attorneys' fees, expert witness fees and costs, and other fees and expenses related to the Tributary Claim." The court ordered that a hearing to determine the amounts to be awarded would be held immediately following the trial on the nontributary claim, at which time the court would "consider the reasonableness of those fees and costs and the necessity of those expenditures."

Following the trial and resulting dismissal of the nontributary claim, the objectors sought recovery of attorney fees, expenses, and costs pursuant to the order dismissing the tributary claim under C.R.C.P. 41(a)(2) and also sought costs under C.R.C.P. 54(d) incident to the judgment of dismissal of the nontributary claim. AWDI opposed the requested awards. The court then held a three day evidentiary hearing to determine the amounts to be awarded to the objectors. At the conclusion of the hearing the court made findings and entered a judgment for the objectors in amounts totaling $2,236,790.40 for attorney fees, expenses including expert witness fees, and costs incurred in defending

against the tributary claim, as well as $473,091.31 for other costs incident to the litigation resulting in dismissal of the nontributary claim.[39]

AWDI challenges the awards on several bases. First, it asserts that a court cannot condition voluntary dismissal of a claim on the payment of attorney fees, expenses, and costs under C.R.C.P. 41(a)(2), for to do so would violate section 13–17–102(5), 6A C.R.S. (1987), and C.R.C.P. 11. Second, AWDI argues that because of the unique nature of water adjudication and based upon Colorado Uniform Water Court Rule 5(b), Rule 41(a)(2) is not applicable to litigation concerning water rights. Third, AWDI contends that the awards were improper and excessive because the court employed an incorrect standard in evaluating the C.R.C.P. 41(a)(2) claims, and the evidence adduced in support of those claims was legally insufficient. Finally, AWDI challenges the amount of the costs awarded to the objectors under C.R.C.P. 54(d) as an abuse of discretion, lacking in sufficient evidentiary support, and not based on sufficient findings.

The objectors assert that AWDI cannot contest the awards made under C.R.C.P. 41(a)(2) because they were ordered incident to the dismissal of the tributary claim, which AWDI requested. We first address this threshold issue and then consider AWDI's objections to the awards.

### A. *Whether AWDI can Contest the Conditions of Dismissal of the Tributary Claim*

The objectors contend that having asked for and enjoyed the benefit of voluntary dismissal without prejudice, AWDI cannot now be heard to complain about the terms imposed as a condition of the dismissal by the court. The terms were imposed pursuant to C.R.C.P. 41(a)(2), which provides in relevant part:

> [Subject to an exception not applicable here], an action shall not be dismissed at the plaintiff's instance save upon order of

---

**39.** The court detailed the nature and amounts of the awards to each of the individual objectors

who received such awards.

the court and upon such terms and conditions as the court deems proper.... Unless otherwise specified in the order, a dismissal under this subsection (2) is without prejudice.

Fed.R.Civ.P. 41(a)(2) is virtually identical, so federal precedent will be helpful in resolving this issue. *See United States v. Bell,* 724 P.2d 631, 645 n. 18 (Colo.1986); *Harding Glass Co., Inc. v. Jones,* 640 P.2d 1123, 1125 n. 3 (Colo.1982); *United Bank of Denver Nat'l Assoc. v. Shavlik,* 189 Colo. 280, 282, 541 P.2d 317, 318 (1975).

Generally, a plaintiff may not appeal from an order granting its request for voluntary dismissal. *Jensen v. Matthews–Price, M.D.,* 845 P.2d 542, 543 (Colo.App.1992); *accord Unioil, Inc. v. E.F. Hutton & Co., Inc.,* 809 F.2d 548, 555–56 (9th Cir.1986), *cert. denied,* 484 U.S. 822, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987) & 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987); *LeCompte v. Mr. Chip, Inc.,* 528 F.2d 601, 603 (5th Cir.1976); *see also* 9 Wright & Miller § 2376. This rule is premised on the rationale that "such a dismissal cannot be characterized as an involuntary adverse judgment against the plaintiff." *Jensen,* 845 P.2d at 543; *see also* 5 James Wm. Moore et al., *Moore's Federal Practice* ¶ 41.05[3] (2d ed. 1993). As the United States Court of Appeals for the Fifth Circuit has noted, when such a dismissal is granted,

> the plaintiff has acquired that which he sought, the dismissal of his action and the right to bring a later suit on the same cause of action, without adjudication of the merits. The effect of this type of dismissal is to put the plaintiff in a legal position as if he had never brought the first suit.

*LeCompte,* 528 F.2d at 603.

In the present case, however, the dismissal was conditioned on terms imposed by the court under C.R.C.P. 41(a)(2) and to which AWDI never assented. The Colorado Court of Appeals has stated that rather than accept the terms and conditions of dismissal, "if a trial court places 'terms and conditions' upon a dismissal under C.R.C.P. 41(a)(2) which are unacceptable to plaintiff, plaintiff is entitled to elect to proceed with the litigation." *Powers v. Professional Rodeo Cowboys,* 832 P.2d 1099, 1104 (Colo.App.1992); *accord, e.g., Marlow v. Winston & Strawn,* 19 F.3d 300 (7th Cir.1994); *Unioil,* 809 F.2d at 554; *see also* 9 Wright & Miller § 2366. We have not previously been required to decide whether a plaintiff who disagrees with the legal or factual basis for terms or conditions imposed in an order dismissing a claim on the plaintiff's motion may choose not to proceed with litigation of the claim and yet preserve a right to challenge the terms and conditions on appeal.

The federal circuits have not adopted a single consistent analytic approach in deciding whether a plaintiff can appeal conditions imposed upon it under Fed.R.Civ.Proc. 41(a)(2) pursuant to a voluntary dismissal without prejudice. *Cauley v. Wilson,* 754 F.2d 769, 770 (7th Cir.1985); *see also* discussion in *Unioil,* 809 F.2d at 555–56. Some cases have held that conditions imposed in voluntary dismissal orders can be challenged on appeal only if they amount to legal prejudice. *Unioil,* 809 F.2d at 555–56; *LeCompte,* 528 F.2d at 603. The condition of payment of the opposing party's costs and expenses has been stated to constitute prejudice in a practical sense but not legal prejudice. *Unioil,* 809 F.2d at 555–56; *LeCompte,* 528 F.2d at 603. The same court that decided *LeCompte,* however, has suggested that there will be cases

> in which the amount of money set as the price of a voluntary dismissal without prejudice is so clearly unreasonable as to amount to appealable 'legal prejudice'.... We will examine each case to ensure that the terms and conditions accompanying the grant of a plaintiff's Rule 41(a)(2) motion are not so outrageous as to demand a full appellate review.

*Yoffe v. Keller Indus., Inc.,* 580 F.2d 126, 131 (5th Cir.1978), *cert. denied,* 440 U.S. 915, 99 S.Ct. 1231, 59 L.Ed.2d 464 (1979); *see also Mortgage Guaranty Ins. Corp. v. Richard Carylon Co.,* 904 F.2d 298, 300–01 (5th Cir. 1990); *Scholl v. Felmont Oil Corp.,* 327 F.2d 697, 700 (6th Cir.1964). This approach tends to intermingle the issue of entitlement to review and that of the reasonableness of the payment imposed. The Seventh Circuit Court of Appeals in *Cauley* adopted a more direct approach and permitted review of a

condition to voluntary dismissal in order to assess abuse of discretion. The court explained:

> [A] plaintiff may understand that the dismissal without prejudice is conditioned on paying attorneys' fees yet disagree with the amount of fees awarded. Thus an order awarding attorneys' fees may qualify as an involuntary adverse judgment even though the plaintiff requested and received the Rule 41(a)(2) dismissal.

*Cauley*, 754 F.2d at 771; *see GAF Corp. v. Transamerica Ins. Co.*, 665 F.2d 364, 367–68 (D.C.Cir.1981).

■ We adopt the approach in *Cauley* and also consider it appropriate to take cognizance of challenges to the legal propriety of imposing terms and conditions of dismissal, which we view as an assertion of "legal prejudice." *See Unioil*, 809 F.2d at 555–56; *LeCompte*, 528 F.2d at 603. Of course, it must also be shown in order to challenge a term or condition of dismissal on appeal that the party seeking dismissal did not actually acquiesce in imposition of the condition. *Mortgage Guaranty*, 904 F.2d at 300.

In the present case AWDI was aware that terms and conditions would be imposed incident to its voluntary dismissal. When the trial court orally granted AWDI's motion to dismiss on October 10, 1991, the court stated that the dismissal was subject to the condition that AWDI pay to the objectors "all attorney fees and expert witness fees and other fees and expenses incurred by the objectors that are otherwise appropriate during the pendency of this litigation which relate to the tributary claim." AWDI then proceeded to trial on October 15, 1991, on the nontributary claim alone.

Although aware of the terms and conditions imposed, AWDI never acquiesced to them. AWDI asserted in proceedings before the trial court that such terms and conditions were not legally permissible and has consistently maintained this position in the trial court and on appeal. The court in *LeCompte* determined that the plaintiff had not acquiesced to the conditions of dismissal where he not only objected to the inclusion of the defendant's proposed conditions in the dismissal order, but vigorously renewed his ob-

jections after the court issued its order, and—failing to obtain relief—then brought an appeal. The fact that the plaintiff never sought to have the voluntary dismissal set aside was not considered dispositive. *LeCompte*, 528 F.2d at 604.

We hold that a party such as AWDI that obtains a voluntary dismissal of its claims subject to terms and conditions to which it consistently maintains its objections may challenge those terms and conditions as legally impermissible or as an abuse of discretion on appellate review. We consider it especially appropriate to address the challenge to the amount of the fees and expenses imposed here, because the amount had not been quantified at the time AWDI decided to go forward with the nontributary claim alone.

B. *Whether Section 13–17–102(5) or C.R.C.P. 11 Precludes an Award of Attorney Fees and Expenses Incident to Dismissal of the Tributary Claim*

AWDI asserts that a requirement for payment of attorney fees and expenses as a term or condition of an order granting voluntary dismissal of a claim cannot be imposed in the absence of evidence and findings satisfying the requirements of section 13–17–102(5), 6A C.R.S. (1987), and C.R.C.P. 11—provisions which have no analogs in the federal statutes or rules. We disagree.

■ As earlier noted, C.R.C.P. 41(a)(2) provides that, with exceptions not pertinent here, "an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper." Section 13–17–102(5) provides:

> No attorney fees shall be assessed if, after filing suit, a voluntary dismissal is filed as to any claim or action within a reasonable time after the attorney or party filing the dismissal knew, or reasonably should have known, that he would not prevail on said claim or action.

C.R.C.P. 11 provides, in pertinent part:

> Reasonable expenses, including a reasonable attorney's fee, shall not be assessed if, after filing, a voluntary dismissal

or withdrawal is filed as to any claim, action or defense, within a reasonable time after the attorney or party filing the pleading knew, or reasonably should have known, that he would not prevail on said claim, action, or defense.

AWDI argues that the trial court could not impose attorney fees as a term or condition of dismissal under C.R.C.P. 41(a)(2) in the absence of a finding that AWDI did not move to dismiss within a reasonable time after it knew or reasonably should have known that it would not prevail on its tributary claim, as required by section 13–17–102(5) and C.R.C.P. 11. AWDI asserts that both those provisions are applicable whenever payment of attorney fees is imposed upon a party incident to dismissal of a claim, including dismissals under C.R.C.P. 41(a)(2).

Preliminarily, we note that AWDI offers no case support for its assertion that section 13–17–102(5) and Rule 11 apply to limit a trial court's discretion to impose terms and conditions on a grant of voluntary dismissal under Rule 41(a)(2). The limited number of Colorado cases that have interpreted the latter rule have never mentioned any limitation of that kind. *See Tillery v. District Ct.,* 692 P.2d 1079, 1084 (Colo.1984) (trial court may award costs and fees to defendant as a term and condition of voluntary dismissal); *Powers v. Professional Rodeo Cowboys,* 832 P.2d 1099, 1102 (Colo.App.1992) (same).

More importantly, the purpose of Rule 41 is different than the objectives of section 13–17–102(5) and Rule 11. The language of both section 13–17–102 and Rule 11 expresses an intention to sanction a party who has continued to pursue a claim after the party or its attorney knew or should have known that the party would not prevail, i.e., that the claim is not meritorious.[40] No such language is present within Rule 41(a)(2).[41] Rule 41(a)(2) is intended to give the plaintiff the right to dismiss a claim that may later become viable or may be asserted later in a different forum, provided the court can ensure the defendant will not be unfairly prejudiced. *Tillery,* 692 P.2d at 1084; *accord McCall–Bey v. Franzen,* 777 F.2d 1178, 1184 (7th Cir.1985) (terms and conditions imposed pursuant to Rule 41(a)(2) are the "quid pro quo" of allowing plaintiff to dismiss a potentially meritorious claim without being prevented by the doctrine of res judicata from bringing the same suit again); *GAF Corp.,* 665 F.2d at 369 ("[n]o matter how conscientious and diligent [plaintiff] may have been, [defendant] suffered some costs by defending this action ... and [defendant] is entitled to such reimbursement of those costs as the court may order"); *LeCompte,* 528 F.2d at 604 (Rule 41(a)(2) "allows the plaintiff to withdraw his action from the court without prejudice to future litigation"); 9 Wright & Miller § 2362. According to *Tillery,* a plaintiff's Rule 41(a)(2) motion to dismiss voluntarily without prejudice "generally should be granted," *Tillery,* 692 P.2d at 1085, but the court must first determine that any harm to the defendant may be avoided by imposing terms and conditions of dismissal.

Thus, a court's focus when determining appropriate terms and conditions under C.R.C.P. 41(a)(2) is necessarily on a remedy for the defendant, not punishment of the plaintiff. Rule 41(a)(2) provides a means for preserving a potentially meritorious claim for another day or another forum provided that conditions of dismissal can be devised to protect the defendants from prejudice. Section 13–17–102(5) and Rule 11, on the other hand, are intended to protect a plaintiff from imposition of attorney fees upon dismissal of an unmeritorious claim provided that the plaintiff seeks dismissal promptly after learning that the claim cannot prevail.

**40.** In fact, article 17, part 1, of the statute, in which § 13–17–102 appears, is captioned "Frivolous, Groundless, or Vexatious Actions," and is commonly known as the "frivolous and groundless litigation statute." 17 Colo.Law 465 (1988). *See also* § 13–17–101, 6A C.R.S. (1987) (legislative declaration that statute addresses claims that are "substantially frivolous, substantially groundless, or substantially vexatious"); *Shaw v. Baesemann,* 773 P.2d 609, 611 (Colo.App.1989)

("Both the title and purpose of the statute evince an intent to apply it only to frivolous, groundless, or vexatious actions.").

**41.** In its reply brief in this court, AWDI acknowledges that "Rule 41(a)(2) is not intended to punish the party voluntarily dismissing a claim, nor to serve any purpose other than reimbursement."

Although AWDI asserts that allegedly erroneous pretrial rulings by the trial court destroyed the prospects for success in establishing the tributary claim, AWDI has never conceded or suggested that such a claim was not meritorious or that it will not reassert such a claim in the future. We therefore reject AWDI's argument that imposition of a requirement of payment of attorney fees as a condition of voluntary dismissal without prejudice of a claim under C.R.C.P. 41(a)(2) violates either section 13–17–102(5) or C.R.C.P. 11.

C. *Whether the Special Nature of Water Adjudication Proceedings Precludes the Award of Fees and Expenses Incident to Dismissal of the Tributary Claim*

■■■ AWDI also contends that the condition concerning payment of fees and expenses that was included in the court's C.R.C.P. 41(a)(2) order of dismissal of the tributary claim fails to take account of and is inconsistent with the unique nature of water right adjudication. We disagree.

AWDI notes that, unlike typical civil cases, once an application for determination of a water right or a right to nontributary ground water is filed, any person who wishes may file a statement of opposition, without complying with traditional standing requirements. *See* § 37–92–302(1)(b), 15 C.R.S. (1990); *Bunger v. Uncompahgre Valley Water Users Ass'n*, 192 Colo. 159, 165, 557 P.2d 389, 392 (1976). Thus, an applicant has no control over the number of objectors who participate in an action, or the fees and expenses they may generate. AWDI asserts that for this reason the imposition of fees and expenses in a water case can quickly become unfairly burdensome on the applicant. Every potential applicant, regardless of financial resources, would have to consider the possibility of future payment of objectors' fees and expenses in the event the applicant should later wish to dismiss its application. AWDI asserts that Colorado Uniform Water Court Rule 5(b)[42] reflects this distinction

between water court proceedings and other civil actions in its provision for voluntary dismissals. Rule 5(b) requires court approval for withdrawal of a water rights application if a statement of opposition has been filed, but makes no provision for the imposition of "terms and conditions."

A note at the beginning of the Uniform Local Rules For All State Water Court Divisions provides in relevant part, "[e]xcept as expressly provided in these rules, the Colorado Rules of Civil Procedure ... shall apply to water court practice and procedure." Rule 5(b) contains no indication that C.R.C.P. 41 is not fully applicable to water cases. The fact that the number of objectors who need protection from prejudice by terms and conditions in an order of voluntary dismissal is large provides no persuasive reason to permit an applicant to obtain dismissal of a claim without providing such protection. We reject the contention that C.R.C.P. 41(a)(2) does not apply to water right adjudications.

D. *Whether the Trial Court Employed an Incorrect Standard or Relied on Insufficient Evidence in Assessing Fees and Expenses Incident to Dismissal of the Tributary Claim*

AWDI asserts that even if the trial court could award fees and expenses as a condition of voluntary dismissal of a claim, the court erred by employing an incorrect standard in determining the extent to which the fees and expenses are allowable. Furthermore, AWDI contends, evidence adduced in support of the amounts assessed was legally insufficient.

1. *Correctness of Standard*

■■■ We first address whether the court used the correct standard in determining attorney fees and expenses. AWDI argues that the trial court did not properly limit the award to those fees and expenses for activities that were rendered useless by the dis-

---

42. Rule 5(b) provides:
An application against which a statement of opposition has been filed shall not be withdrawn or dismissed except by order of the court.

Rule 5(b), Uniform Local Rules For All State Water Court Divisions, 7B C.R.S. (1993 Supp.).

missal. Such a criterion, it contends, is the correct standard for assessing the limits of a permissible award of fees and expenses incident to a voluntary dismissal under C.R.C.P. 41(a)(2).

*Tillery* contains some guidance concerning the proper standard:

> The district court could require the costs and fees to be reimbursed as a condition of granting the motion to dismiss, although consideration should be given to the fact that the defendants may recoup some of the fees if they prepare an answer to the petitioner's complaint in federal court.

*Tillery*, 692 P.2d at 1085. Because C.R.C.P. 41(a)(2) is "identical to the corresponding federal rule and the rules adopted by several other states," *Tillery*, 692 P.2d at 1084, it will also be helpful to look to the standards applied in cases outside this jurisdiction for guidance. Federal courts have consistently limited reimbursement under Fed.R.Civ.P. 41(a)(2) to expenses for work that will not be useful in future litigation of the same claim. *Lau v. Glendora Unified School District*, 792 F.2d 929, 932 (9th Cir.1986) (Reinhardt, J., concurring) (defendant "not entitled to reimbursement of costs and legal fees incurred in preparing work product that may be useful in continuing litigation"); *McCants v. Ford Motor Co., Inc.*, 781 F.2d 855, 860 (11th Cir.1986) (where a subsequent similar suit between the parties is contemplated, expenses awarded might be limited to those incurred in discovering information that will not be useful in the later suit); *Cauley*, 754 F.2d at 772 (trial court found to have abused its discretion in awarding fees for work product which could be useful in defending same claim in state court where claim was being pursued); *McLaughlin v. Cheshire*, 676 F.2d 855, 856–57 (D.C.Cir.1982) (no entitlement to reimbursement for expenses in preparing work product that will be useful in continuing litigation in another forum); *GAF Corp.*, 665 F.2d at 369 (same); *Brown v. Zackert*, 10 Kan.App.2d 466, 701 P.2d 711, 714 (1985) ("while the conditions of dismissal are within the discretion of the court, the range of that discretion is confined to terms which relieve the defendant from the potential waste occasioned by the dismissal"). These cases are

consistent with *Tillery* and provide helpful elaboration of the standard that we suggested in that case.

AWDI asserts that the trial court failed to apply this standard in the present case. In issuing the payment order, the trial court noted that dismissal of the tributary claim had previously been conditioned on the applicant's payment to the objectors of "all of their attorney fees, expert witness fees, costs, fees, and other expenses related to the tributary claim." AWDI contends that the words "related to" sweep too broadly and asserts that this language is evidence that the trial court improperly ordered the payment to the objectors of all expenses having anything to do with the tributary claim, including those incident to gathering information also useful in litigating the nontributary claim or that could be used against AWDI in future litigation of the tributary claim.

The remainder of the trial court's order, however, indicates that the court properly considered the danger of overlap with the nontributary claim and the possibility that work expended on the tributary claim would be useful in future litigation of the latter claim. The court rejected the possibility that work devoted to the tributary claim would be useful in future litigation of that claim, stating:

> Depending on when a new tributary claim may be filed, much of the material discovered by Objectors prior to September 1991 will be outdated, if not useless, in any hearing concerning a "new" tributary claim. Any benefit from this earlier discovery is speculative at best.

In addition, the trial court expressly recognized the necessity of avoiding reimbursement of expenses incurred in gathering information useful in litigation of the nontributary claim. Out of concern about the possibility of "overlap," among other things, the court discounted the award of attorney fees and expense claims by ten percent.

Other than the court's use of the phrase "related to the tributary claim," AWDI offers no support for its contention that the trial court failed to apply the proper standard limiting its award of attorney fees and costs under Rule 41(a)(2) to expenses for work that

it determined was not useful in defending against the nontributary claim or would not be of use in future litigation of a renewed tributary claim. We reject the contention that the trial court used the wrong standard in awarding fees and expenses.

### 2. *Sufficiency of Evidence*

AWDI asserts that even if the court used the proper standard, the evidence was insufficient to identify the fees and expenses incurred for work useful only on the tributary claim, failed to establish that the scope of the work on that claim was reasonable, and failed to show the reasonableness of the amounts charged for such work. We disagree with each of these assertions.

### a. *Identification of Fees and Expenses Attributable to Tributary Claim*

AWDI as well as the objectors understood that determining an appropriate award might be difficult due to the possibility of overlap between the work performed and information gathered by the objectors to defend against the nontributary claim which went to trial and the efforts directed to defend against the tributary claim which was dismissed. This difficulty occurred in part because until AWDI unexpectedly moved to dismiss the tributary claim, the objectors had no reason to distinguish carefully between the two claims in maintaining their records of work performed and expenses incurred.

▮▮▮ The party requesting an award of attorney fees bears the burden of proving by a preponderance of the evidence its entitlement to such an award. *Kinsey v. Preeson,* 746 P.2d 542, 551–52 (Colo.1987) (citing *Board of County Comm'rs v. Auslaender,* 745 P.2d 999, 1001–02 (Colo.1987)); *see* § 13-25–127, 6A C.R.S. (1987) (burden of proof in any civil action, except claim for exemplary damages or body execution, "shall be by a preponderance of the evidence"); *Spensieri v. Farmers Alliance Mutual Ins. Co.,* 804 P.2d 268, 271 (Colo.App.1990) ("If the attorney provides a reason and rational basis for

the work done, he or she should be compensated accordingly...."); *see also Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984) (when the fee claimant has carried his burden of showing that the claimed rate and number of hours are reasonable, the product is presumed to be the reasonable fee contemplated by 42 U.S.C. § 1988). Counsel is not required "to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures." *Hensley v. Eckerhart,* 461 U.S. 424, 437 n. 12, 103 S.Ct. 1933, 1941 n. 12, 76 L.Ed.2d 40 (1983). This was done.

▮▮▮ In this case the objectors' attorneys introduced time records kept contemporaneously with work done. The extent of the information varied, and the records kept by the private attorneys were generally more detailed than those of the government attorneys, but all included the date, the attorney, the time expended, and a general statement of work done.[43]

In addition, attorneys for the objectors testified as to the manner in which they allocated fees and expenses between the tributary and nontributary issues for the purpose of their claims under C.R.C.P. 41(a)(2). For instance, the lead attorney for the United States testified that virtually all of his time was devoted to the tributary claim, "but we decided to make the figure 85 percent, which is, I think, a very conservative estimate." The attorney for Oliver Powell Roemer III and Howard Platz testified that the concerns of both of those clients were limited to the tributary claim. He averred, "By definition, if the water was nontributary, it could not affect their water rights. Only tributary claims could affect their water rights." Accordingly, the fees and expenses incurred on behalf of those clients were limited to the tributary claim.

In response to AWDI's assertion that the objectors' work defending against the tributary claim must have been used in litigating

---

43. The attorneys' time records introduced into evidence contained excisions for time spent on portions of the case other than the tributary claim. Although AWDI objected to such excisions, we fail to see how they inhibited the trial court's ability to evaluate the unexcised portions and determine whether they applied to the tributary claim.

the nontributary claim, an attorney for Rio Grande Water Users Association and San Luis Valley Water Conservancy District stated:

There's a big difference between trying a tributary claim and a nontributary claim. In a nontributary claim, all you've got to show is impact on any stream of one-tenth of 1 percent. In a tributary claim, you've got to know which stream systems are impacted and what amounts with a good deal of greater precision.…

This attorney also testified, "[Y]ou spend a lot of time on a whole broad range of issues related to—on a tributary case that would never come up in a nontributary setting." In order to allocate accurately the time spent on each claim, this counsel reviewed all of his firm's billing statements, covering attorney fees and expenses, and

went through line by line, item by item, for every month and every year since the inception of this litigation and made a determination of what time I felt was fairly attributable to our work on the tributary claim and excluded all remaining time and used that to come up with a total number of hours and a total amount of expenses.

As a result of this review, he determined that fifty-eight percent of the attorney fees was attributable to the tributary claim. The attorney for Rio Grande Water Conservation District testified that he too went through the bills submitted by his firm to the District from 1987 through 1991 in order to identify those attorney fees and expenses related to the tributary claim.

Expert witness fees and expenses were allocated in a similar fashion. The objectors' attorneys testified that those experts involved in aspects of both the tributary and the nontributary claims were asked to itemize their monthly bills and provide a breakdown of costs they considered attributable to the tributary and nontributary claims, and that they did so. In most instances, documents in the form of letters, bills, and/or affidavits from expert witnesses were admitted to support the attorney testimony.

Although all these allocations were made after the fact, they nonetheless provide support for the court's award determinations.

The trial court was provided with an adequate evidentiary basis to find as it did that the objectors' allocations were adequate. The Tenth Circuit Court of Appeals, in a case involving an application for attorney fees and costs under the Civil Rights Attorney's Fees Award Act, recognized:

[S]ome lawyers will not have kept contemporaneous time records. We do not forbid, retrospectively, the use of reconstructed time records and do not demand that the reconstructed hours be arbitrarily reduced.

*Ramos v. Lamm,* 713 F.2d 546, 553 n. 2 (10th Cir.1983). In a number of other cases as well, reconstructed time records have been held adequate to establish time expended. *See Pawlak v. Greenawalt,* 713 F.2d 972, 978 (3d Cir.), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 172 (1984); *Bonnette v. California Health & Welfare Agency,* 704 F.2d 1465, 1473 (9th Cir.1983); *Johnson v. University College,* 706 F.2d 1205, 1207 (11th Cir.1983), *cert. denied,* 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983); *Weber v. Weinberger,* 651 F.Supp. 1379, 1393 (W.D.Mich.1987). Here, the contemporaneous time records existed and were presented to the court; only the relevant allocations had to be supplied in part by estimates. None of the objectors realized at the time the records were kept that AWDI would later be required to pay the attorney fees and expenses and that division by issue would be necessary, and AWDI claims no bad faith on the part of the objectors in this case.

"It is elementary that the trier of fact can look to either testimony or exhibits which have been admitted into evidence for the facts upon which to base his decision." *Hartman v. Freedman,* 197 Colo. 275, 280, 591 P.2d 1318, 1321 (Colo.1979). Based on our own review of the record, we conclude that the evidence, including billing records and testimony concerning allocation of time and expenses, was sufficient to permit the trial court, applying the proper standard, to allocate fees and expenses between those that were allowable and those that were not. We therefore sustain the trial court's allocation.

### b. Scope of Work Performed in Defense of Tributary Claim

AWDI contends that some of the attorney fees and expenses incurred by the objectors and attributable to the defense of the tributary claim were unnecessary or excessive. As principal support for that contention, it presented the testimony of two experienced natural resource attorneys at the fees hearing. The first expressed the opinion that some of the matters the objectors investigated, in particular the issue of potential injury to vested water rights, should have been deferred until after the court determined whether the water was tributary. Furthermore, in that expert's opinion, the objectors are not entitled to recover any costs of initiated discovery. He asserted that because the burden of proving absence of injury and sufficiency of water supply is on the applicant, the objectors' role is simply to stand back and take issue with what an applicant has presented, or request more information. Accordingly, any investigation beyond this would be inappropriate or a luxury and should not be the subject of compensation.

The trial court, however, did not accept this view of the scope of activity reasonably to be conducted by objectors to an application for determination of water rights. The trial court properly rejected this passive model of an objector's role, pointing out the need for evidence from both sides in order to arrive at a correct resolution and the practical need or advantage for an objector to resist an adjudication of a water right in the first instance by demonstrating that an applicant cannot satisfy the criteria for establishment of such a right.

AWDI's second expert witness on the excessive scope issue asserted that the amount of fees and expenses to be reimbursed should be reduced because the objectors failed to mitigate those fees and expenses. He contended that the objectors realized early in the litigation that no water contracts had been entered into between AWDI and any prospective beneficial users of the water. According to that expert, because such a defect is fatal to the application for determination of a tributary water right in this case,[44] the objectors should have moved for summary judgment on the tributary claim, and they should not now be compensated for the "unnecessary" fees and expenses incurred subsequent to the date at which this motion should have been made. The water contracts issue, however, was not relevant to some of the beneficial uses claimed by AWDI.[45] The trial court considered the expert's opinion and in its written order for attorney fees and expenses specifically found that "there would have been genuine material fact [sic] at issue that would have required the Court to deny a motion for partial summary judgment on the tributary claim."[46] On this record, we cannot say that the objectors incurred unnecessary expenses because they did not seek partial summary judgment on the tributary claim.

Lastly, AWDI contends that the number of experts hired by the objectors to analyze and review the State's ground water computer modeling was excessive and therefore wasteful. Based upon our review of the record of the fees hearing, we are satisfied that the trial judge adequately considered the reasonableness and the necessity of the services provided by those experts.

44. In order to obtain a decree for a conditional water right, an applicant must demonstrate an intent to appropriate. Where the applicant is seeking to appropriate for the future needs and uses of others, it must present sufficient evidence to demonstrate their commitment to actual beneficial use of the water. "[M]ere negotiations with other municipalities clearly do not rise to the level of definite commitment for use required to prove the intent here required." *Colo. River Water Cons. Dist. v. Vidler Tunnel Water Co.*, 197 Colo. 413, 417, 594 P.2d 566, 568 (1979).

45. The expert's testimony does not take account of the fact that AWDI proposed to use some of the water to be produced for irrigation of its own lands in the Valley, a use not subject to the *Vidler* requirements.

46. Moreover, the witness himself testified that the date on which it should have been clear to the objectors that no contracts existed was no sooner than November of 1990, four years after the start of litigation and well after most of the attorney fees and expenses at issue had been incurred.

For the foregoing reasons, and because our own review of the record discloses no suggestion that the objectors sought recovery for work not necessary to their defenses, we affirm the trial court's rejection of AWDI's arguments that the objectors incurred unnecessary fees and expenses by reason of the scope of their efforts in defending against the tributary claim.

### c. Reasonableness of Amounts Charged for Fees and Expenses

The United States Supreme Court has stated that while " 'there is no precise rule or formula' for determining attorney's fees," *Evans v. Jeff D.,* 475 U.S. 717, 735–36, 106 S.Ct. 1531, 1542, 89 L.Ed.2d 747 (1986) (quoting *Hensley,* 461 U.S. at 436, 103 S.Ct. at 1941), the proper starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939 (considering fee to be awarded under 42 U.S.C. § 1988); *accord Ramos,* 713 F.2d at 552 (same); *Spensieri,* 804 P.2d at 270 (estimate of a reasonable attorney fee involves a calculation of the "lodestar" amount, which represents the number of hours reasonably expended multiplied by a reasonable hourly rate); *see Mau v. E.P.H. Corp.,* 638 P.2d 777 (Colo.1981).

AWDI has not challenged the amount of time spent by attorneys for the objectors on particular tasks as excessive. Instead, it has contended that the usefulness of the tasks themselves was not limited to the tributary claim and that the scope of the work performed was not reasonable. These objections were rejected earlier in the immediately preceding sections of this opinion.

■ AWDI also has not objected to the reasonableness of the hourly rate charged by attorneys from private law firms. It has stipulated that $100 per hour, the rate charged, was a reasonable rate for those attorneys. Nor has AWDI objected to the rates charged by lawyers for the United States, who were on the staff of the United States attorney. AWDI does object to the rates at which the State's attorneys, who were on the staff of the State attorney general, billed their time. The State claimed, and the court awarded, $100 per hour for attorney time and $50 per hour for the time of legal assistants. AWDI objects to this award because the interdepartmental billings for services of attorneys and legal assistants on the staff of the State attorney general at the relevant time were based on hourly rates of $40.75 and $27.44 respectively. AWDI argues that the state employees cannot be awarded more than these hourly rates. We disagree.

Rule 41(a)(2) expressly gives the court power to grant a motion for dismissal under the rule upon such terms and conditions as the court deems proper. Thus, determination of the terms and conditions of dismissal under 41(a)(2) is discretionary with the trial court and will not be disturbed on review absent an abuse of that discretion. *Stevedoring Servs. of America v. Armilla Int'l,* 889 F.2d 919, 921 (9th Cir.1989); *Moore v. C.R. Anthony Co.,* 198 F.2d 607, 608 (10th Cir. 1952); *Bishop v. W. American Ins. Co.,* 95 F.R.D. 494, 495 (N.D.Ga.1982); *see American Cyanamid Co. v. McGhee,* 317 F.2d 295, 298 (5th Cir.1963) (trial court has discretion to impose terms and conditions); *see also Powers,* 832 P.2d at 1102. Typically, courts impose as a term and condition of dismissal a requirement that the plaintiff pay the defendant the expenses incurred in defending the suit, which usually include reasonable attorney fees. *Marlow v. Winston & Strawn,* 19 F.3d 300 (7th Cir.1994); *Mortgage Guaranty,* 904 F.2d at 300; *LeCompte,* 528 F.2d at 603; *Bath Iron Works Corp. v. Parmatic Filter Corp.,* 736 F.Supp. 1175, 1178 (D.Me.1990). The award of attorney fees must be reasonable, and "[t]he determination of reasonableness is a question of fact for the trial court and will not be disturbed on review unless it is patently erroneous and unsupported by the evidence." *Hartman v. Freedman,* 197 Colo. 275, 281, 591 P.2d 1318, 1322 (1979) (fees awarded pursuant to § 8–4–114, C.R.S. (1973)); *accord Rifkin v. Steele Platt,* 824 P.2d 32, 35 (Colo.App.1991); *Spensieri,* 804 P.2d at 270; *Greeley Nat'l Bank v. Sloan,* 677 P.2d 409, 412 (Colo.App.1983). The trial judge considered the reasonableness of fees issue and expressly determined that "[one]

hundred dollars an hour by water lawyers ... is an extremely minimum rate and eminently reasonable, whether it be in the public or the private sector."

We have previously held that attorneys are entitled to an award of reasonable attorney fees at market rates for attorneys of comparable skill, experience and reputation: [47]

> If the fee requested is reasonable in light of community standards and the other criteria to be considered by the court, it is not appropriate for a court to take into consideration what a major client may pay the attorney on an hourly basis or the possible absence of overhead expenses comparable to those borne by lawyers in private practice.

*Mau*, 638 P.2d at 780 (attorney fees awarded to tenant's attorney pursuant to section 38–12–103(3)(a), 16A C.R.S. (1973) (citation omitted)); *see also Spensieri*, 804 P.2d at 271 ("The criterion for the court is not what the parties agreed, but what reflects reasonable value for services rendered."). Numerous other courts have held that fees awarded are to be "based on reasonable billing rates in the relevant community, not net hourly earnings." *Hamilton v. Daley*, 777 F.2d 1207 (7th Cir.1985) (fees awarded to government attorneys defending against frivolous civil rights suit; fact that attorneys are public servants who will not personally receive any fees awarded makes no difference).[48] Therefore, we find that the hourly rate awarded to the State of Colorado for attorney fees and paralegal services was not an abuse of discretion.

AWDI also contends that the amounts allowed for expert witnesses and consultants were unreasonable or unsubstantiated. AWDI points to no particular bills as unreasonable in amount. The objectors documented these fees with billing records, expert testimony summaries, and testimony by attorneys and state personnel as to the nature of the work performed, the method of allocation of expenses between the tributary and nontributary claims, and the reasonableness of the fees charged. There was evidence, although general in nature, that the fees were reasonable for the services performed.

The trial court did not simply award to the objectors all attorney fees and expenses requested. Instead, it examined the claims made and assessed the reasonableness and substantiation given for the claims. The trial judge disallowed: (1) the state's claim for reimbursement of $9,000 for court reporter fees; its claim of $173,818 for compensation for nonlegal employees of the Division of Wildlife and the State and Division Engineers' Offices; and its claim of $1300 for a bat detector; (2) the "unsubstantiated or unverified" claims of Cotton Creek Ranch, Dennis Felmlee and Timothy Lovato; (3) compensation for time and attorney fees spent post-trial in preparing the fee application; and (4) certain room and board expenses. In addition, the trial court, "out of an abundance of caution and so as to preclude any concerns about vagueness, overlap, possible redundancy or questionable expense," discounted the attorney fee and expense claims under Rule 41(a)(2) by ten percent.

In similar cases with voluminous fee applications, courts have recognized that it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application. *See Copeland v. Marshall*, 641 F.2d 880, 903 (D.C.Cir.1980) (en banc) (22% cut); *Ross v. Saltmarsh*, 521 F.Supp. 753, 761–62 (S.D.N.Y.1981) (5% and 10% cuts), *aff'd mem.*, 688 F.2d 816 (2d Cir.1982); *Kane v. Martin Paint Stores, Inc.*, 439 F.Supp. 1054, 1056 (S.D.N.Y.1977) (10% cut), *aff'd mem.*, 578 F.2d 1368 (2d Cir. 1978). These courts have endorsed per-

---

**47.** As for legal assistants, *see Missouri v. Jenkins*, 491 U.S. 274, 287–88, 109 S.Ct. 2463, 2471–72, 105 L.Ed.2d 229 (1989), in which the Supreme Court concluded that the district court properly compensated the work of paralegals at market rates rather than at their cost to attorneys.

**48.** *See* cases involving the federal civil rights statute, 42 U.S.C. § 1988 (1982). The federal courts have consistently held that public interest attorneys are entitled to an award of reasonable attorney fees based upon the market rate within the community. *See Blum v. Stenson*, 465 U.S. 886, 892–96, 104 S.Ct. 1541, 1545–48, 79 L.Ed.2d 891 (1984); *Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983); *see also Oten v. Colorado Bd. of Social Services*, 738 P.2d 37, 42 (Colo.App. 1987).

centage cuts as a practical means of trimming fat from a fee application. *New York Ass'n for Retarded Children v. Carey*, 711 F.2d 1136 (2d Cir.1983). We sustain the trial court's determination of the amounts to be awarded for attorney fees and expenses attributable to defenses of the tributary claim.

### 3. *Summary*

The trial judge concluded that most of the attorney fees and expenses incurred by the objectors in defending the tributary claim "were both necessary and reasonable." Having participated in each stage of the proceeding, the trial judge was capable of understanding what was reasonably expended in attorney fees. *San Juan Products, Inc. v. San Juan Pools of Kansas, Inc.*, 849 F.2d 468, 476 (10th Cir.1988); *see also Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1201 (10th Cir.1986) (since the trial court saw attorney's work first hand, it has far better means of knowing what is just and reasonable than does the appellate court). It also heard the testimony of expert witnesses, and was familiar with much of their work product in the form of exhibits.

A determination of reasonableness is a question of fact for the trial court and 'will not be disturbed on review unless it is patently erroneous and unsupported by the evidence.' If ... the statute pursuant to which an award of attorney fees is made, does not provide a specific definition of 'reasonable,' then such compensation should be determined in light of all circumstances for the time and effort reasonably expended by the prevailing party's attorney.

*Spensieri*, 804 P.2d at 270 (citations omitted).

The trial judge made findings and conclusions to support his determinations. The attorneys for the objectors testified that they coordinated efforts among themselves so as to minimize duplication of effort and expenses. The trial judge found that they "were very careful to minimize expenses and eliminate duplication of effort." The trial court also found that many of the early expenses incurred by the objectors were the result of AWDI's failure of timely and complete compliance with discovery requests. All these findings, though general, are sufficient and supported by the record.

We conclude that AWDI's challenge to the amount of attorney fees, expenses, and costs awarded as a condition to voluntary dismissal of the tributary claim under C.R.C.P. 41(a)(2) must fail.

### E. *Whether Excessive Costs were Awarded Incident to Dismissal of the Nontributary Claim*

AWDI also challenges the amount of costs awarded to the objectors under C.R.C.P. 54(d), taking issue with the sufficiency of the evidence and the judge's findings, and asserting abuse of discretion in setting the amount of the award.

C.R.C.P. 54(d) provides, "costs shall be allowed as of course to the prevailing party unless the court otherwise directs...." Section 13–16–122 lists those items includable as costs.[49] The objectors submitted bills of costs under C.R.C.P. 54(d) of $473,091.31 for costs related to the nontributary claim, and the trial court awarded that entire amount.

The principal costs claimed under Rule 54(d) were for expert witness fees. "[C]harges for expert witnesses approved pursuant to section 13–33–102(4)" are ex-

---

49. Section 13–16–122, 6A C.R.S. (1987), provides:

*Items includable as costs.* (1) Whenever any court of this state assesses costs pursuant to any provision of this article, such costs may include:

(a) Any docket fee required by article 32 of this title or any other fee or tax required by statute to be paid to the clerk of the court;

. . . . .

(e) The witness fees, including subsistence payments, mileage at the rate authorized by section 13–33–103, and charges for expert witnesses approved pursuant to section 13–33–102(4);

(f) Any fees for exemplification and copies of papers necessarily obtained for use in the case;

. . . . .

(j) Any item specifically authorized by statute to be included as part of the costs.

pressly allowed as costs under section 13–16–122(1)(e). Section 13–33–102(4), 6A C.R.S. (1987), provides:

Witnesses in courts of record called to testify only to an opinion founded on special study or experience in any branch of science or to make scientific or professional examinations and state the result thereof shall receive additional compensation, to be fixed by the court, with reference to the value of the time employed and the degree of learning or skill required.

■ Rio Grande Water Conservation District claimed $257,227.00 in expert witness fees, the United States claimed $126,640.13, and the State claimed $65,810.94. AWDI contends that the award of these fees was improper because "there was no evidence of the reasonableness or necessity of the work or the expert testimony." This is not so.

AWDI presented a set of expert witnesses who offered opinions, supplemented by numerous exhibits, concerning the complex geologic and hydrologic features of the San Luis Valley, including the movement of underground water, and the effect of pumping underground water on surface streams and waters tributary thereto. This testimony was complemented by a computer model, and expert testimony was offered concerning the design, operation, and results achieved by use of the model. All of this evidence was offered in support of AWDI's claim that the withdrawal of underground water in the quantities sought in its amended application would not produce effects inconsistent with the classification of the water as nontributary under the statutory definition in section 37–90–103(10.5) 15 C.R.S. (1990). In response to this evidence, the objectors introduced experts and a computer model developed by the State in an effort to discredit the picture of the geologic and hydrologic characteristics of the Valley drawn by AWDI's experts and the validity of AWDI's computer analysis, all directed to showing that the statutory test for nontributariness was not satisfied. The evidence was highly technical and in many instances sharply conflicting. Ultimately, the trial judge concluded that AWDI had not successfully established that the test for nontributariness had been met.

The judge was present at the trial and therefore could evaluate first hand the necessity of each witness's testimony. See Leadville Water Co. v. Parkville Water Dist., 164 Colo. 362, 367, 436 P.2d 659, 661 (1967). Furthermore, during the three day evidentiary hearing, billing statements and testimony were offered to demonstrate that the witness fees requested were both necessary and reasonable. Because of the existence of all the above support, the Fenton case, relied upon by applicants for their contention that a claim for "lump sum witness fees" is improper, is inapposite. See Fenton v. Fibreboard Corp., 827 P.2d 564, 569 (Colo.App.1991) aff'd in part and rev'd in part on other grounds by Fibreboard Corp. v. Fenton, 845 P.2d 1168 (Colo.1993). The party requesting fees in Fenton provided no documentation indicating a reasonable basis upon which the sums requested were calculated, nor were the actual sums expended for the witnesses' services shown. Fenton, 827 P.2d at 569.

■ Pursuant to section 13–33–102(4), 6A C.R.S. (1986), courts may grant witness fees to experts, testifying as such, in such amounts as they deem proper. Denver Joint Stock Land Bank v. Board of County Comm'rs, 105 Colo. 366, 372, 98 P.2d 283, 287 (1940); accord Lamont v. Riverside Irr. Dist., 179 Colo. 134, 142, 498 P.2d 1150, 1154 (1972) (assessment of expert witness fees is addressed to the sound discretion of the trial court) (1972); Leadville Water Co., 164 Colo. at 367, 436 P.2d at 661 (1967) (same). The court is authorized, in fixing an expert's fee, to consider not only the time spent in court but also the time spent by the expert in preparation for trial. Yeager Garden Acres, Inc. v. Summit Constr. Co., 32 Colo.App. 242, 245–46, 513 P.2d 458, 460 (1973). In addition, allowances awarded may include travel, ordinary witness fees, food, and lodging expenses. Leadville Water Co., 164 Colo. at 366, 436 P.2d at 661. The trial judge here determined that the entire amount requested by the objectors under Rule 54(d) should be awarded. This was not an abuse of discretion. The award was amply supported by billing statements and expert testimony summaries, as well as testimony concerning the nature and purpose of the services upon

which the witness fees were based and the manner by which they were determined. "When we have before us the finding of a trial judge who had the opportunity to evaluate the services of the experts based upon all the evidence before him and arrive at a fair conclusion of their reasonable worth, we do not interfere with his finding." *Leadville Water Co.*, 164 Colo. at 367, 436 P.2d at 661.

Some of the miscellaneous expenses that the court awarded as costs are not listed in section 13–16–122. AWDI asserts that any items not included within the definition of costs under that section or otherwise allowed by statute or rule may not be awarded, and insists that the trial court's award to the United States of $16,873.52 for setting up an office in Alamosa, including leasing office furniture and equipment, was therefore unauthorized. It also asserts that the court's award to the Rio Grande Water Users of $5,000 for photocopying expenses and $1,500 "for postage, for messengers, for mileage, and telephone," was improper for the same reason. As to "miscellaneous" expenses, we have held that:

> The list of expenses that may be awarded as costs under section 13–16–122 ... is illustrative and not exclusive. *Church v. American Standard Ins. Co. of Wisconsin*, 764 P.2d 405, 406 (Colo.App.1988). In general, absent a specific prohibition, the trial court has discretion over the awarding of costs. *Id.; see Rossmiller v. Romero*, 625 P.2d 1029, 1030 (Colo.1981).

*Cherry Creek School District # 5 v. Voelker*, 859 P.2d 805, 813 (Colo.1993) (quoting *Ferrell v. Glenwood Brokers, Ltd.*, 848 P.2d 936, 940 (Colo.1993)). *See also* 6 James Wm. Moore et al., *Moore's Federal Practice* ¶ 54.70[5] (2d ed. 1993):

> In an action tried to the court, the court has a large discretion in admitting in evidence all pertinent matters which in the

court's view would expedite the trial and which would give the court and the parties a clear conception of the points in issue; and may allow as costs the actual and reasonable expenses attendant thereto, although no express statutory enactment so provides.

Given logistical difficulties presented by the location and duration of the trial and the extensiveness of the exhibits, we conclude the trial court was within its discretion in allowing costs to the United States for establishing a temporary office in Alamosa. We also affirm the award to the Rio Grande Water Users for photocopying and other miscellaneous expenses.[50]

In summary, we reject AWDI's challenges to the award of costs under C.R.C.P. 54(d).

### VII. *Conclusion*

For the foregoing reasons the judgments of the District Court for Water Division 3 are affirmed.

SCOTT, J., does not participate.

---

**50.** AWDI cites a decision of the Colorado Court of Appeals, *Shultz v. Linden–Alimak, Inc.*, 734 P.2d 146 (Colo.App.1986), in which the court disallowed the award of expenses incurred for photocopies, blueprints, long distance phone calls, and postage as costs because "[t]here is no statutory authorization for including these items as part of the costs." *Id.* at 150. That case has since been criticized in *Perkins v. Flatiron Struc-* *tures Co.*, 849 P.2d 832, 836 (Colo.App.1992). In that later case, the court of appeals pointed out that § 13–16–122(1)(f) expressly authorizes an award for copies of papers necessarily obtained for use in the case. AWDI does not contend that the photocopies were not necessarily obtained for use in this case. It was therefore within the discretion of the trial court to award photocopying expenses. *See id.* at 836.